[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 26, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-13935

_____

D. C. Docket No. 06-00322-CR-TCB-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TOROS SEHER,
a.k.a. Torrez,
CHAPLIN'S, INC.,
CHAPLIN'S MIDTOWN, INC.,

Defendants-Appellants.

_____

No. 07-14055

_____

D. C. Docket No. 06-00322-CR-01-TCB-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHAPLIN'S, INC.,
CHAPLIN'S MIDTOWN, INC.,

Defendants-Appellants.

_____

No. 07-15919

_____

D. C. Docket No. 06-00322-CR-01-TCB-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TOROS SEHER,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(March 26, 2009)**

Before BIRCH and PRYOR, Circuit Judges, and STROM,[*] District Judge.

BIRCH, Circuit Judge:

_____

[*] Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

Toros Seher, Chaplin's, Inc. ("Chaplin's"), and Chaplin's Midtown, Inc. ("Midtown") (collectively "the Appellants") appeal their convictions and sentences for various offenses related to money laundering and federal transaction reporting requirements. After a jury trial, the Appellants were found guilty of money laundering, in violation of 18 U.S.C. § 1956(a)(3)(B)–(C), and of failure to file Form 8300 for various transactions, in violation of 31 U.S.C. § 5324(b)(1), (d)(2). Seher also was found guilty of conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). The district court denied the Appellants' motion for judgment of acquittal and new trial and issued a preliminary order of forfeiture against them. After reviewing the record and the parties' briefs and hearing oral argument, we AFFIRM the Appellants' convictions and sentences. Because the district court both failed to address factual and legal issues regarding portions of the forfeiture order and made clearly erroneous factual findings, we AFFIRM in part and VACATE and REMAND in part the forfeiture order.

## I. BACKGROUND

A. Factual Background

1. Events at the Gold & Diamond Depot

The initial events relevant to this appeal took place between 1996 and 2002, when Seher was working at the Gold & Diamond Depot, Inc. ("the Depot"), a jewelry store located in Greenbriar Mall in Atlanta, Georgia. At trial, the government put forward as witnesses four drug dealers who purchased jewelry from Seher at the Depot during this time period — Garrette Ragland, Walter Dean Johnson ("Johnson"), Delano McDowell, and Clifton James Manning. At the time they made their purchases, all of these witnesses trafficked exclusively in cocaine, with the exception of Manning, who also sold marijuana.

The witnesses' accounts of their interactions with Seher share many elements of commonality. They always made their purchases in cash, which came from drug proceeds and often had been separated into bundles rubber-banded in thousand-dollar increments.[1] They all stated, however, that they never explicitly discussed drugs with Seher nor told him that their cash came from drug sales, though Johnson expressed the belief that Seher was aware of the origin of the funds.[2] For larger purchases, after the purchaser had chosen a particular piece of jewelry, Seher would usher him through a swinging door into a back room behind

_____

[1] The witnesses also noted that their drug sales always involved cash and that they kept track of the proceeds by separating them into thousand-dollar amounts, which they would wrap with rubber bands and carry around in plastic grocery bags or shoe boxes.

[2] Manning mentioned that, on one occasion, Seher commented on the drug-like aroma of the cash that Manning had been holding in a plastic bag which previously had contained marijuana.

4

the main counter to complete the sale.[3] The buyer would then have a seat next to a desk, Seher would open up a drawer in that desk, and the buyer would place his cash inside the drawer. On some occasions, Seher had the buyer place the cash in a safe inside the back room instead. Seher typically would not count the money at that time. The witnesses further testified that Seher never asked them to fill out the forms required for cash purchases of more than $10,000 nor requested that they provide the identifying information needed to complete such forms.[4] Ragland, Johnson, and Manning were aware of this reporting requirement, and all four indicated that they would have been reluctant to provide such information for fear of creating a paper trail and might not have shopped at the Depot if they had been forced to do so.

Ragland estimated that he bought more than $200,000 worth of jewelry from Seher between 1996 and 2000, with fifteen to twenty of these purchases totaling more than $10,000. He stated that some of his fellow drug dealers who had purchased jewelry from Seher first introduced him to Seher. Ragland also described how Seher had assisted him after he was arrested for cocaine

---

[3] Some purchases were made by passing cash over the counter rather than in the back room. The testimony appears to indicate that this occurred when the transaction involved less than $10,000.

[4] Federal law requires merchants to complete a Form 8300 for all cash transactions in excess of $10,000. See 31 U.S.C. § 5324(b)(1); United States v. Leventhal, 961 F.2d 936, 937 (11th Cir. 1992) (per curiam).

5

distribution. He called Seher after receiving a post-arrest forfeiture order on a watch Seher had sold him. According to Ragland, Seher indicated that he already was aware of Ragland's arrest and that he would handle the situation. In a later phone call, Seher apparently stated that he had obtained the forfeited jewelry and that he would try to sell it for Ragland, though Ragland had no further communications with Seher thereafter.[5]

Johnson testified that he had purchased approximately $90,000 to $100,000 worth of jewelry from Seher between 1997 and February 2002, when he was arrested for conspiracy to distribute cocaine. Though no one introduced Johnson to Seher, Johnson recommended Seher to multiple drug dealers and specifically instructed them to tell Seher that he had referred them. After Johnson was arrested, he telephoned Seher and requested his assistance in selling a watch Johnson previously had purchased from Seher. According to Johnson, Seher agreed to help and eventually gave him approximately $6000 in exchange for the watch — a description confirmed by Johnson's sister.

---

[5] An FBI forfeiture investigator confirmed that the FBI had received claims letters in December 2000 and January 2001 from Seher regarding the watch, attached to which were a number of documents including a receipt for the watch and photocopies of ten checks, which were in sequential order and drawn from the account of Beverly Johnson ("Ms. Johnson"). Ragland testified that Seher instructed Ragland to have Ms. Johnson, Ragland's common-law wife, bring Seher some blank, undated checks to help in recovering the watch.

McDowell testified that his jewelry purchases from Seher totaled over $100,000, with four or five of those in excess of $10,000. Johnson apparently first introduced McDowell to Seher, and McDowell likewise brought drug dealers whom he knew to Seher. McDowell also stated that Seher expressed a willingness to buy back jewelry from McDowell if the latter ever fell upon hard times. McDowell made his last purchase from Seher, a bracelet for his wife costing about $8500, around December 2001. At the time McDowell was arrested in March 2002, however, he had paid only $6000 of this price, so Seher took the bracelet back and sold it to someone else.

Manning testified that he was first introduced to Seher by Paul Rosser, a fellow drug dealer who also made purchases from Seher. During this initial visit, Manning bought a bracelet for $8000. Seher explicitly refused to provide a receipt for the purchase, instead deeming a handshake sufficient. On other occasions, Manning purchased at least ten items from Seher costing more than $10,000, including one shopping spree when he spent almost $200,000. He also stated that Seher obtained over $800,000 worth of diamonds for Manning to give to his drug supplier, for which Manning paid Seher in cash.

Manning also described the circumstances surrounding his 1999 arrest. The police, in the course of responding to a fire at his house, discovered about twenty

kilograms of cocaine in his dryer and arrested Manning. After Manning was released on bond, Seher called his cell phone and stated that he had heard what had happened, though he did not explain to Manning how he became aware of the arrest. A few days later, Manning went by the Depot and Seher gave him some of the jewelry which Manning had lost during the fire, but Seher would not say how he had obtained it.

2. Events at Chaplin's and Midtown

The second series of events relevant to this appeal occurred at two other jewelry stores in Atlanta, Chaplin's and Midtown. Chaplin's and Midtown were incorporated separately, but shared common elements. The two companies had related owners — Seher co-owned Midtown and his brother Parseg owned Chaplin's.[6] Seher had official positions at both — Vice President, Chief Financial Officer, and Secretary at Midtown and Secretary at Chaplin's. Chaplin's also made most of the jewelry for Midtown, and workers at Midtown would fill in for absent employees at Chaplin's.

During 2005 and 2006, IRS Special Agent James Perkins met with Seher on multiple occasions at both Chaplin's and Midtown. Perkins bought several

---

[6] Parseg Seher may have been a co-owner of Chaplin's with Sahin Corluoglu, who was listed as an incorporator on that company's articles of incorporation. Corluoglu was also the President of Midtown, which he co-owned with Seher.

expensive pieces of jewelry from Seher under the pretense of being a narcotics trafficker. Perkins testified that Seher acted strangely when they negotiated prices. For instance, Seher repeatedly would stop speaking whenever the situation called for him to quote a particular price and instead would write the amount down on some paper, which he would immediately rip into shreds. The prices that Seher would write down also were not the actual prices but instead had a zero removed, such as $2200 instead of $22,000, so that the figures never exceeded $10,000. A similar practice occurred whenever Seher would state the price orally.

Perkins first met Seher on 28 April 2005, when he entered Chaplin's with Kim Hubbard, the wife of a major Atlanta drug dealer. The previous day, Ms. Hubbard had called Chaplin's to arrange a meeting with Seher. Perkins' goal was to purchase a set of wedding rings for more than $10,000 cash without having to complete any governmental forms. Upon entering Chaplin's, Perkins and Ms. Hubbard unexpectedly encountered a friend of Ms. Hubbard's who attempted to assist them with the purchase. Soon afterward, Seher began to help all three of them. Perkins intimated to Seher that he was involved in an illegal business, noted that Seher "pretty much know the realm that we in," and discussed "peeping the game," a reference to the drug business. Gov. Exh. 5 at 36, 40. After Perkins selected a ring, Seher proposed that Perkins pay for it by having Perkins, Ms.

9

Hubbard, and her friend come in separately and each pay part of the price — a plan that Perkins understood would avoid federal filing requirements. Eventually, Perkins agreed to return with the appropriate amount of cash, after which Seher would begin working on the jewelry.

When Perkins and Ms. Hubbard returned to Chaplin's on 21 July 2005, Seher was unable to find the rings they had selected, so they chose new ones. Perkins and Seher then negotiated the price, in the course of which, Perkins informed Seher that "[t]he dope game is hot right now." Gov. Exh. 7 at 11. Seher eventually quoted $220 as the cash price, which Perkins understood as actually reflecting a cash price of $22,000. Perkins gave Seher $3000 in cash. Seher did not give him a receipt, but instead gave him a yellow note bearing the numbers "2200.00," "1900.00" and "300.00," which, according to Perkins, represented $22,000, $19,000, and $3000 — the total price of the rings, the amount owed for the rings, and the amount paid, respectively.

The following day, Perkins came back to Chaplin's to pick up the one wedding ring that was ready. Upon arrival, Seher escorted him into a back room, and Perkins gave Seher $19,000 in cash which he had previously wrapped in a rubber band. According to Perkins, Seher put the cash into a safe without counting it first. Perkins then told Seher that he did not want to have any paperwork for the

10

transaction in his name, and Seher assured him that there would be none. Perkins never completed a Form 8300 for this transaction, nor did Seher request the information needed to complete that form. Perkins returned to Chaplin's on 25 August 2005 and obtained the other wedding ring.

On 28 October 2005, Perkins called Seher at Midtown to inform him that he planned to stop by at some point the following week to get a watch he previously had ordered.[7] Perkins called Seher back on 3 November 2005 to arrange the details. Since the watch was at Midtown, Seher gave Perkins the option of meeting at either Chaplin's or Midtown. Perkins chose the latter, claiming it was because of the lack of security there. After Perkins arrived at Midtown later that afternoon, Seher informed him that the watch cost $12,800, and Perkins gave him that amount in cash. The invoice Seher provided listed the price of the watch as $6200. Seher never had Perkins complete a Form 8300 for this transaction and never sought the information necessary to complete that form. Before Perkins left, he remarked to Seher that he needed to leave Atlanta because it was "hot," a term implying that it was difficult to sell drugs there at that point in time. The following day, $6200 in cash was deposited into Midtown's bank account.

---

[7] Perkins called Chaplin's first but was informed that Seher was at Midtown instead. A staff member gave him the phone number for Midtown.

On 20 April 2006, Perkins and a fellow IRS Special Agent, Darryl Hudgins, visited the Midtown store to purchase jewelry from Seher, having previously arranged a meeting for that day. Upon first entering the store, they were assisted by a female staff member. When Perkins first encountered Seher, he explained that he had not been by the store recently because "somebody snatched twenty-five kilos of coke" from him. Gov. Exh. 31 at 1. In response to this statement, Seher joked that he was going to choke Perkins. Hudgins next asked Seher to appraise a watch that he claimed to have purchased from another jeweler for the value of a kilogram of cocaine. Hudgins ultimately decided to purchase two bracelets for $20,000, and Perkins reminded Seher that there should be no paperwork. Seher explained to Hudgins the payment process, doing so exclusively by writing on a notepad rather than verbalizing any statements out loud. In the course of this explanation, Hudgins remarked to Seher that he had been required to complete paperwork when he purchased a car. Seher responded by giving a written description of the $10,000 cash purchase reporting requirement and later explained that the figures he wrote down on the receipt had to be below $10,000 even though the actual price paid would exceed that.[8] Hudgins and Perkins gave Seher $20,000 cash for the two bracelets, and Seher gave them a receipt, which listed the total

---

[8] Seher also later agreed with Hudgins' statement that "the magic thing is to keep it under ten." Gov. Exh. 31 at 28.

12

price as $8800.  In filling out the receipt, Seher permitted Hudgins to use a fake

name ("Joe Flint") and address ("123 Peachtree Road, Atlanta, Georgia").  Gov.

Exh. 31 at 24–25.  He also never asked Perkins or Hudgins to fill out a Form 8300

or for the information needed to complete such a form.  The following day, $8800

in cash was deposited into Midtown's bank account.

B. Procedural History

A grand jury in the United States District Court for the Northern District of

Georgia returned a seven-count indictment against Seher, Chaplin's, and Midtown

on 25 July 2006 and a superseding seven-count indictment against all three on 23

August 2006.  Count One of the indictment charged the Appellants with conspiracy

to launder money known to represent the proceeds from a specified unlawful

activity, in violation of 18 U.S.C. § 1956(h).[9]  Counts Two, Four, and Six charged

them with laundering property represented to be the proceeds from a specified

unlawful activity on three separate occasions, in violation of 18 U.S.C.

§ 1956(a)(3)(B)–(C).  Counts Three, Five, and Seven charged them with failing to

---

[9] The unlawful activity in question was the distribution of cocaine, which is a felony under 21 U.S.C. § 841(a)(1).  Count One discussed three disjunctive intents for the money laundering:  promoting the carrying on of cocaine distribution, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); concealing or disguising the nature of proceeds from that distribution, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and avoiding a federal transaction reporting requirement, in violation of 18 U.S.C. § 1956(a)(1)(B)(ii).  As part of this count, Seher was alleged to have facilitated the use of drug proceeds to make jewelry purchases as a means to conceal the nature and source of the proceeds.

13

file a Form 8300 — as required for each of the transactions listed in Counts Two, Four, and Six — an action which violated 31 U.S.C. § 5324(b)(1), (d). The indictment also contained a provision in which the government sought forfeiture, pursuant to 18 U.S.C. § 982(a)(1) and 31 U.S.C. § 5317(c)(1), of the complete inventory of jewelry owned or held by Seher, Chaplin's, or Midtown and of real property at a particular address in Atlanta, along with money judgments in the amounts involved in the various offenses.

Before trial, the district court dismissed Count One as to Midtown, but the case proceeded to a jury trial in February 2007 against the Appellants on the remaining counts. After the government presented its case, the Appellants moved to dismiss the indictment or for judgments of acquittal. The court granted these motions in part, dismissing Count One against Chaplin's and entering judgments of acquittal on Counts Four, Five, Six, and Seven against Chaplin's and Counts Two and Three against Midtown. The court also dismissed the portion of Count One against Seher dealing with conspiracy to launder money in order to promote an unlawful activity, in this case, the selling of cocaine. The defendants then entered guilty pleas regarding Counts Three, Five, and Seven — Seher to all three, Chaplin's to Count Three, and Midtown to Counts Five and Seven. The jury subsequently found the defendants guilty on all of the remaining counts — Seher

14

as to Counts One, Two, Four, and Six, Chaplin's as to Count Two, and Midtown as to Counts Four and Six.

After the completion of trial, Chaplin's, Midtown, and Seher filed a motion for judgment of acquittal and a new trial, which the district court denied. The government moved for a preliminary order of forfeiture against Chaplin's, Midtown, and Seher, which the district court granted. The forfeiture order encompassed: a $1,610,400 money judgment against Seher, real property owned by Seher, all bank accounts and inventory seized from Chaplin's and Midtown in July 2006, and a $54,800 money judgment against Seher, Chaplin's, and Midtown. All three defendants appealed the issuance of this order. In August 2007, the court sentenced Chaplin's and Midtown to five years of probation for each count, to run concurrently, and to fines of $50,000 and $62,500 per count, respectively.[10] It also imposed special assessments of $800 for Chaplin's and $1600 for Midtown. Chaplin's and Midtown appealed these convictions and sentences. In December 2007, the district court sentenced Seher to 72 months of imprisonment for Counts One, Two, Four, and Six and 60 months of imprisonment for Counts Three, Five, and Seven, with a supervised release of three years for each count, all of which would run concurrently. The court also imposed a special assessment of $700 on

---

[10] The total fines were $100,000 for Chaplin's and $250,000 for Midtown. The court also incorporated those portions of the order of forfeiture that applied to the two companies.

15

him.  Seher appealed his convictions and sentences.  Seher, Chaplin's, and Midtown filed a motion to consolidate their three appeals, which we granted.

## II. DISCUSSION

The Appellants raise a total of ten issues.  They all assert that the district court erred by not dismissing Counts Two, Four, and Six because those counts failed to charge offenses and that their conviction on those counts violated the Fifth Amendment.  The Appellants also argue that those three counts were duplicitous, that the district court's jury charge constructively amended those counts, and that there was insufficient evidence to convict them on those counts.  Seher asserts that there was insufficient evidence to convict him on Count One either because the government did not prove that a conspiratorial agreement existed or because the evidence established multiple conspiracies rather than a single one.  Chaplin's and Midtown contend that the district court erred by ordering forfeiture of their inventories and accounts and that this forfeiture constituted an excessive fine under the Eighth Amendment.  The Appellants all contest the personal money judgments entered against them, and Seher challenges the forfeiture of his property as a substitute asset.  Finally, Seher maintains that his sentence for Counts Three, Five, and Seven was unreasonable.  We address these issues in turn.

A. <u>Issues Regarding Counts Two, Four, and Six</u>

16

1. Failure to Charge an Offense

According to the Appellants, Counts Two, Four, and Six of the First Superseding Indictment failed to charge an offense because they did not identify the requisite state of mind necessary to violate § 1956(a)(3).[11] The Appellants contend that this absence meant that the grand jury failed to make the appropriate specific intent findings and that their subsequent convictions on these charges therefore violated their rights under the Fifth Amendment. They thus assert that the district court erred in failing to dismiss these counts.

We review de novo the legal question of whether an indictment sufficiently alleges a statutorily proscribed offense, though a district court's denial of a motion to dismiss an indictment is reviewed for abuse of discretion. See United States v. Pendergraft, 297 F.3d 1198, 1204 (11th Cir. 2002). We will not uphold a criminal conviction "if the indictment upon which it is based does not set forth the essential elements of the offense." United States v. Gayle, 967 F.2d 483, 485 (11th Cir. 1992) (en banc). "[I]f the facts alleged in the indictment warrant an inference that

_____

[11] The Appellants, in their discussion of the indictment's failure to charge an offense, also submit that the district court erred by concluding that § 1956(a)(3)(B) and § 1956(a)(3)(C) represent alternative elements of intent for the same offense rather than two distinct offenses requiring different elements of proof. However, they do not allege any Fifth Amendment violation with respect to this issue. We view this argument as a variation on their claim that the indictment was duplicitous and thus address it as part of our analysis of that issue. We also note that the Appellants concede that the indictment provided them with adequate notice of the charges against them and thus did not violate the Sixth Amendment.

the jury found probable cause to support all the necessary elements of the charge," the indictment satisfies the Fifth Amendment. United States v. Fern, 155 F.3d 1318, 1325 (11th Cir. 1998). Additionally, we need not find an indictment "defective simply because it fails to allege mens rea so long as the allegation that the crime was committed with the requisite state of mind may be inferred from other allegations in the indictment." United States v. Woodruff, 296 F.3d 1041, 1046 (11th Cir. 2002) (quotation marks and citation omitted). As a general rule, "practical, rather than technical, considerations govern the validity of an indictment." United States v. Hooshmand, 931 F.2d 725, 735 (11th Cir. 1991) (quotation marks and citation omitted). Finally, we note that several of our sister circuits have held that where, as here, the defendant challenges the indictment after the government's case has ended, the indictment should be construed in a liberal manner in favor of validity. See United States v. Sabbeth, 262 F.3d 207, 218 (2d Cir. 2001); United States v. Gooch, 120 F.3d 78, 80 (7th Cir. 1997); United States v. Lucas, 932 F.2d 1210, 1218 (8th Cir. 1991).

Counts Two, Four, and Six of the indictment charged as follows:

On or about [date], in the Northern District of Georgia, the defendants . . . did knowingly and intentionally conduct a financial transaction, namely, sold [description of jewelry] for [amount] in United States currency, involving property represented to be the proceeds of specified unlawful activity by a law enforcement officer, in violation

18

of Title 18, United States Code, Sections 1956(a)(3)(B) and 1956 (a)(3)(C).

R1-31 at 2–5. Sections 1956(a)(3)(B) and (C), referenced in these counts, state the necessary intent for a money laundering offense.[12] Under the former subsection, an offender must have the intent "to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(3)(B). The latter provision requires that the offender intend "to avoid a transaction reporting requirement under State or Federal law." Id. § 1956(a)(3)(C).

At issue is whether the indictment's statutory references warrant an inference that the grand jury found probable cause for all the essential elements of the offenses charged. The most analogous case appears to be Fern, in which the indictment charged the defendant with making "false statements" in violation of the Clean Air Act. Fern, 155 F.3d at 1325 (quotation marks omitted). Though the

---

[12] 18 U.S.C. § 1956(a)(3) states:

(3) Whoever, with the intent —
    (A) to promote the carrying on of specified unlawful activity;
    (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
    (C) to avoid a transaction reporting requirement under State or Federal law,
conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, . . . shall be fined . . . or imprisoned . . . , or both.

19

indictment referenced the relevant statute, 42 U.S.C. § 7413(c)(2), it did not mention the materiality of these statements, an essential element of the offense. See 42 U.S.C. § 7413(c)(2)(A); id. at 1326. We concluded that this charge was sufficient for Fifth Amendment purposes because the indictment's reference to a particular statutory subsection created a reasonable inference that the grand jury found that the false statements mentioned therein were material. See Fern, 155 F.3d at 1326.

Similarly, in United States v. Arteaga-Limones, 529 F.2d 1183, 1199 (5th Cir. 1976), we addressed an indictment that did not mention that the defendant imported marijuana "knowingly or intentionally," an essential element of the charged offense. However, the indictment referenced the relevant statutory sections, which discussed those scienter requirements. See Arteaga-Limones, 529 F.2d at 1199. We found that the elements of the offense did not have to "be alleged in terms" and focused on whether the indictment "fairly import[ed] knowledge or intent." Id. Given this framework, we concluded that the statutory references were sufficient to make the indictment not defective, particularly since the court instructed the jury that it had to find knowledge or intent to convict the defendant. See id. at 1200.

These cases indicate that the Fifth Amendment is satisfied if the indictment makes a specific statutory reference to an essential element of the offense and contains some other indication from which we can infer that the grand jury found that element to be present. See Fern, 155 F.3d at 1326. The indictment in this case did not spell out the different forms of intent required for the offenses alleged in Counts Two, Four, and Six. However, it did include the word "intentionally" as well as specific references to the statutory provisions which described the different forms of intent required to violate the money laundering statute. This combination of statutory citation and reference to the essential element discussed in that statutory subsection serves as a reasonable basis for inferring that the grand jury found that the Appellants committed money laundering with the intents described in those statutory subsections. See id. In fact, the rationale for making such an inference arguably is even stronger here than in Fern, since here the statutory reference is to a specific subsection rather than to a section in general.[13] See id.

Appellants contend that this interpretation of Fern conflicts with United States v. Hess, 124 U.S. 483, 8 S. Ct. 571 (1888). They specifically refer to language in Hess stating that "[t]he omission [of an essential element of the crime]

_____

[13] The indictment in Fern referenced only § 7413(c)(2). See id. We found that the only portion of that provision which could be applicable to the false statements count was subsection (A), which mentioned "false material statement[s]." Id. As a result, we concluded that the only rational reading of the count was that it involved a violation of § 7413(c)(2)(A). See id.

21

cannot be supplied by intendment or implication, and the charge must be made directly, and not inferentially, or by way of recital." Hess, 124 U.S. at 486, 8 S. Ct. at 573. However, the Court in Hess was addressing whether the indictment sufficiently alleged the factual circumstances comprising a mail fraud scheme, not the legal elements of the offense. See id. at 487, 8 S. Ct. at 573 (noting that "the absence of all particulars of the alleged scheme renders the count as defective as would be an indictment for larceny without stating the property stolen, or its owner or party from whose possession it was taken"). In addition, Hess focused on whether the defendant had proper notice of the charges, rather than on whether the grand jury could find the essential elements of the charge. See id. at 487, 8 S. Ct. at 573. We thus read the language cited by the Appellants as referring to the omission of facts pertaining to the charge, not to the omission of legal elements from the charge, as occurred here.[14] Hess therefore would not alter our analysis of the indictment in this case. We note, however, that, even if Hess did apply to legal issues, we would still find the indictment here sufficient for Fifth Amendment purposes. The indictment identified the particulars of the offense committed, and

_____

[14] Appellants' citation of United States v. Adkinson, 135 F.3d 1363 (11th Cir. 1998), is inapposite for the same reason. In that case, we concluded that an indictment failed to state all the essential elements of a bank fraud offense because it never alleged the defendants actually executed a bank fraud scheme. Id. at 1376–78. As in Hess, the relevant omissions thus were factual rather than legal.

there was no need to infer scienter since the statutes pertaining to intent were specified in the indictment.

Accordingly, we find that the indictment did not fail to charge an offense and presented no Fifth Amendment violation. The district court thus did not abuse its discretion in denying Appellants' motion to dismiss Counts Two, Four, and Six on this basis.

2. Duplicity

The Appellants also contend that the district court erred in denying their motion to dismiss Counts Two, Four, and Six because those counts were fatally duplicitous. They premise their duplicity argument on the assumption that § 1956(a)(3) contains three different offenses, which means that each of these counts, by referencing subsections (B) and (C) of that provision, charged two different offenses.

As a preliminary matter, we note that the Appellants appear to have waived their ability to raise this issue because they failed to challenge the indictment on these grounds pre-trial. Generally, a defendant must object before trial to defects in an indictment, and the failure to do so waives any alleged defects. See United States v. Ramirez, 324 F.3d 1225, 1227–28 (11th Cir. 2003) (per curiam) (defendants waived issue of defective indictment where they did not raise a statute

23

of limitations defense to the indictment before trial); <u>see also</u> Fed. R. Crim. P.

12(b)(3), (e).  The only exception to this waiver rule is for claims that the

indictment "fails to invoke the court's jurisdiction or to state an offense," which

may be made at any time during the proceedings.[15]  Fed. R. Crim. P. 12(b)(3)(B).

Our sister circuits generally have held that this exception does not apply to claims

that an indictment was duplicitous, and we see no reason to depart from this

conclusion since a duplicity objection does not implicate jurisdictional issues and

does not assert that the indictment fails to state an offense.[16]  <u>See</u>, <u>e.g.</u>, <u>United</u>

<u>States v. Creech</u>, 408 F.3d 264, 270 (5th Cir. 2005); <u>United States v. Klinger</u>, 128

F.3d 705, 708 (9th Cir. 1997); <u>United States v. Prescott</u>, 42 F.3d 1165, 1167 (8th

Cir. 1994); <u>see also</u> <u>Reno v. United States</u>, 317 F.2d 499, 502 (5th Cir. 1963)

(agreeing with district court's assertion that "[d]uplicity is not a fatal defect")

(quotation marks omitted).

---

[15] A court also may grant relief from the waiver "[f]or good cause."  Fed. R. Crim. P. 12(e).  Good cause is not shown where the defendant had all the information necessary to bring a Rule 12(b) motion before the date set for pretrial motions, but failed to file it by that date.  <u>See</u> <u>Ramirez</u>, 324 F.3d at 1228 n.8.  The Appellants have not asserted that there was good cause here.

[16] It is uncertain whether we previously have made this finding.  In <u>United States v. Busard</u>, 524 F.2d 72, 73 (5th Cir. 1975) (per curiam), we commented that an objection to an indictment as being duplicitous is waived if not made prior to trial.  However, in a later decision dealing with a multiplicitous indictment, we characterized <u>Busard</u>'s waiver discussion as "dicta" and adopted the Sixth Circuit's stance that "'if sentences are imposed on each count of that multiplicitous indictment the defendant is not forced to serve the erroneous sentence because of any waiver.'"  <u>See</u> <u>United States v. Bradsby</u>, 628 F.2d 901, 905–06 (5th Cir. 1980) (citing <u>United States v. Rosenbarger</u>, 536 F.2d 715, 722 (6th Cir. 1976)).

Despite the Appellants' apparent waiver of this issue, the waiver argument has never been raised by the government, though the issue was discussed at oral argument and the Appellants filed supplemental authority on the issue. We have been willing to consider sua sponte whether an issue was waived when an appellant failed to preserve or raise that issue before the district court. See Harden v. United States, 688 F.2d 1025, 1032 n.7 (5th Cir. Unit B 1982). We also are required to raise sua sponte the issue of whether an indictment properly charges an offense, since that represents a jurisdictional issue. See United States v. Peter, 310 F.3d 709, 713 (11th Cir. 2002) (per curiam); United States v. Meacham, 626 F.2d 503, 509 (5th Cir. 1980). However, we conclude that the distinctions between those situations and this matter are sufficient to warrant our not raising the waiver issue. Here, the Appellants did not raise the duplicity issue for the first time on appeal, the district court ruled on the issue in denying the motion to dismiss, and both parties fully briefed the issue on appeal. Additionally, we do not believe that this kind of defective indictment allegation implicates jurisdictional issues.[17] See United States v. Moloney, 287 F.3d 236, 240 (2d Cir. 2002) (noting that a

---

[17] We note that we have yet to address whether Rule 12(b)(3)(B)'s requirement that a defective indictment objection be raised pre-trial operates as a jurisdictional bar. See United States v. Browne, 505 F.3d 1229, 1271 n.31 (11th Cir. 2007) (declining to consider whether the requirement "is a 'claim-processing rule' susceptible to forfeiture or waiver, or whether it is a jurisdictional bar").

25

duplicitous indictment claim does not "implicate[] the jurisdiction of the federal courts"). Since it is not "incumbent upon us to make a waiver argument which the government was willing to forego," we choose not to do so here. Ochran v. United States, 117 F.3d 495, 503 (11th Cir. 1997). We now turn to the merits of the Appellants' duplicity argument.

"A count in an indictment is duplicitous if it charges two or more separate and distinct offenses." United States v. Schlei, 122 F.3d 944, 977 (11th Cir. 1997) (quotation marks and citation omitted). "[T]he key issue to be determined is what conduct constitutes a single offense." Id. In support of the claim that Counts Two, Four, and Six are duplicitous, the Appellants cite United States v. Calderon, 169 F.3d 718, 720 (11th Cir. 1999), in which we stated that "[t]he four subsections of Section 1956(a)(1) are separate offenses," each requiring different elements of proof. They acknowledge that Calderon dealt with a different statutory provision but contend that its discussion is relevant to our analysis since the three subsections of § 1956(a)(3) contain the same language as three of the four subsections in § 1956(a)(1).[18] They submit that it would be incongruous for us to interpret the former differently from the latter.

---

[18] Specifically, § 1956(a)(3)(A), (B), and (C) use the same wording as § 1956(a)(1)(A)(i), (B)(i), and (B)(ii), respectively.

26

Additionally, the Appellants argue that we should analyze duplicity under the test established in <u>Blockburger v. United States</u>, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932), which requires us to look at "whether each provision requires proof of a fact which the other does not." They contend that the subsections of § 1956(a)(3), when evaluated under the <u>Blockburger</u> test, would be separate offenses since each subsection requires proof of an additional fact which the other does not. For example, subsection (C) requires proof that the defendant intended to avoid a transaction reporting requirement, while subsection (B) does not. <u>See</u> 18 U.S.C. § 1956(a)(3)(B)–(C).

The Supreme Court has described the <u>Blockburger</u> test as "a rule of statutory construction." <u>Missouri v. Hunter</u>, 459 U.S. 359, 366, 103 S. Ct. 673, 678 (1983). Specifically, the <u>Blockburger</u> rule helps to determine whether Congress intended to punish the same offense under two different statutes. We ordinarily assume that Congress did not have such an intent. <u>See id.</u>, 103 S. Ct. at 678. "Accordingly, where two statutory provisions proscribe the 'same offense,' they are construed not to authorize cumulative punishments <u>in the absence of a clear indication of contrary legislative intent</u>." <u>Id.</u>, 103 S. Ct. at 678. (quotation marks and citation omitted, emphasis in original). In other words, even if two statutory provisions

27

punish the same offense under the <u>Blockburger</u> test, multiple punishments would be permissible if Congress clearly intended that. <u>See id.</u> at 367, 103 S. Ct. at 678.

In accordance with the Supreme Court's refinement of the <u>Blockburger</u> test, we stated in <u>Schlei</u> that "we must look to congressional intent" in analyzing whether a count in an indictment is duplicitous. <u>Schlei</u>, 122 F.3d at 977. We have not yet examined congressional intent in enacting § 1956(a)(3). The government argues that <u>United States v. Puche</u>, 350 F.3d 1137 (11th Cir. 2003), authorizes charging the intents in § 1956(a)(3)(B) and (C) alternatively. <u>Puche</u> does not explicitly state this, however. Rather, in determining whether there was sufficient evidence to sustain a money laundering conviction under § 1956(a)(3), we outlined the government's burden of proof, which included establishing that the defendant acted with one of the three intents listed under § 1956(a)(3). <u>See</u> <u>Puche</u>, 350 F.3d at 1142–43. We did not discuss whether the three subsections on intent comprised one offense or separate offenses.

We also have not examined congressional intent in enacting § 1956(a)(1), the parallel provision to § 1956(a)(3).[19] The district court and the government

_____

[19] Both sections deal with money laundering offenses, with (a)(1) addressing those cases in which the laundered proceeds actually derive from an unlawful activity and (a)(3) dealing with government sting operations, in which the government, or its representative, "represents that the proceeds are from a specified unlawful activity though in reality they are not." <u>United States v. Magluta</u>, 418 F.3d 1166, 1176 (11th Cir. 2005).

28

correctly point out that our decision in Calderon addressed the issue of sufficiency of the evidence to support a § 1956(a)(1) conviction, rather than duplicity. See Calderon, 169 F.3d at 720. As part of our discussion of the sufficiency issue, we recited the language of § 1956(a)(1) and then stated that, "The four subsections of Section 1956(a)(1) are separate offenses, each of which requires the Government to prove an element not required under the others." Id. After examining the context of that quotation, however, we find it to be dicta. The remainder of the opinion never addresses congressional intent regarding § 1956(a)(1). Instead, we focused solely on whether the evidence at trial evidenced a violation of the promotion subsection, § 1956(a)(1)(A)(i), which was the only portion of § 1956(a)(1) included in the jury charge.[20] See id. Given that we did not analyze congressional intent in Calderon, and since the issue of a duplicitous indictment likewise was not raised or addressed, we are not bound by our statement therein that the subsections of § 1956(a)(1) are separate offenses.

In the absence of controlling case law within our circuit, we find it particularly helpful to look at the analyses of our sister circuits, at least six of which have determined that § 1956(a)(1) does not create separate offenses, only

---

[20] We ultimately concluded that the evidence at trial showed that the defendant at most violated only the concealment and reporting requirements subsections, but that the evidence was insufficient to support a conviction for the promotion subsection. See id. at 722.

29

alternative mental states for a single offense.  See United States v. Garcia-Torres, 341 F.3d 61, 65–66 (1st Cir. 2003); United States v. Bolden, 325 F.3d 471, 487 n.19 (4th Cir. 2003); United States v. Booth, 309 F.3d 566, 571–72 (9th Cir. 2002); United States v. Meshack, 225 F.3d 556, 580 n.23 (5th Cir. 2000), reh'g granted on other grounds, United States v. Meshack, 244 F.3d 367 (5th Cir. 2001); United States v. Navarro, 145 F.3d 580, 592 (3d Cir. 1998); United States v. Holmes, 44 F.3d 1150, 1155–56 (2d Cir. 1995).

The most instructive of these analyses with regard to the question of congressional intent is Navarro.  In that case, the indictment conjunctively charged the defendants with possessing three mental states listed in § 1956(a)(1), i.e., with promotion, concealment, and avoidance of reporting requirements.  See Navarro, 145 F.3d at 585.  However, the district court's instructions to the jury for that charge were in the disjunctive, i.e., the defendant would be guilty if his intent was promotion, concealment, or avoidance of reporting requirements.  See id.  On appeal, the Third Circuit had to decide whether the district court should have instructed the jury that it had to decide unanimously which of the alternative mental states the defendants possessed.  See id.  The Third Circuit, relying on the framework established in Schad v. Arizona, 501 U.S. 624, 631–45, 111 S. Ct. 2491, 2499–504 (1991), examined the issue using a two-step inquiry:  (1) whether

30

the legislature intended to create different means for violating a single offense, and

(2) if it so intended, whether that statutory definition satisfied the Due Process

Clause.  See Navarro, 145 F.3d at 586.  After a lengthy analysis, the court found

that Congress intended for the subsections "to be construed as separate means of

committing the same offense," that this interpretation of the statute raised no due

process concerns, and that there was no risk of jury confusion.[21]  Id. at 590.  The

court found that Congress intended for § 1956 "to punish a financial transaction

involving known illicit proceeds, accomplished for a guilty purpose."  Id. at 592.

"That multiple purposes could satisfy this end does not mean that Congress

intended to create multiple offenses."  Id.  Thus, since the three alternative mental

states in § 1956(a) could be treated as separate means of committing a single

offense, the Third Circuit concluded that no specific unanimity instruction was

required.  See id.

   We agree with Navarro's analysis regarding congressional intent and find it

applicable to § 1956(a)(3) due to the parallels between the subsections of the two

provisions.  Furthermore, we see no policy reasons to interpret this language

differently when addressing money laundering uncovered in a sting operation and

---

[21] In reaching this conclusion, the court found that having multiple mental states for the same course of conduct did not raise any constitutional concerns and did not depart from the historical tradition of unanimity in jury verdicts.  See id. at 589.  These findings outweighed the rule of lenity, which counseled against such an interpretation.  Id. at 589–90.

31

money laundering in general. Accordingly, even if the Appellants are correct that the subsections of § 1956(a)(3) contain different elements of proof and so are different offenses under the Blockburger test, this does not negate the congressional intent to treat § 1956(a) as creating a single offense of money laundering with alternative mental states, subject to only one punishment. See Schlei, 122 F.3d at 977. In fact, permitting an alternative reading would present multiplicity problems because it would permit a defendant to "be convicted of two different money laundering offenses based on the same transaction simply because he knew that his prohibited conduct was designed for two unlawful purposes." Navarro, 145 F.3d at 592 n.6. We therefore find that Counts Two, Four, and Six were not duplicitous and conclude that the district court did not err in denying the Appellants' motion for judgment of acquittal on those grounds.

3. Constructive Amendment

The Appellants assert that the district court's jury charge constructively amended the indictment because: (1) the intent elements were never charged in the indictment, and (2) the court charged the jury in the disjunctive, whereas the indictment's charge was in the conjunctive. In this case, the indictment charged the Appellants with violating § 1956(a)(3)(B) and § 1956(a)(3)(C); however, the

32

jury charge stated that the Appellants could be found guilty if they violated either of those subsections.

"In evaluating whether the indictment was constructively amended, we review the district court's jury instructions . . . in context to determine whether an expansion of the indictment occurred either literally or in effect." United States v. Castro, 89 F.3d 1443, 1450 (11th Cir. 1996) (quotation marks and citation omitted). A jury instruction amends an indictment when it "broaden[s] the possible bases for conviction beyond what is contained in the indictment." United States v. Dennis, 237 F.3d 1295, 1299 (11th Cir. 2001) (quotation marks and citation omitted).

We need not tarry long over the Appellants' arguments on this issue, since they essentially reiterate their claims regarding duplicity and failure to state an offense. We find these allegations equally unpersuasive in their constructive amendment guise. The indictment specifically referenced the statutory subsections on intent, and the jury charge merely tracked the language of those provisions. As such, the jury charge did not expand the bases for conviction as to Counts Two, Four, and Six. See id. (finding that jury instruction which tracked the language of the bankruptcy fraud statute did not amend the indictment). Additionally, § 1956(a)(3)(B) and § 1956(a)(3)(C) are not separate offenses but rather alternative

intents for the single offense of money laundering. "[T]he law is well established that where an indictment charges in the conjunctive several means of violating a statute, a conviction may be obtained on proof of only one of the means, and accordingly the jury instruction may properly be framed in the disjunctive." United States v. Simpson, 228 F.3d 1294, 1300 (11th Cir. 2000). Furthermore, several circuits addressing the analogous provisions of § 1956(a)(1) have concluded that it is permissible to indict in the conjunctive but charge the jury in the disjunctive. See, e.g., Garcia-Torres, 341 F.3d at 65–66; Bolden, 325 F.3d at 487 n.20; Navarro, 145 F.3d at 592. We therefore conclude that the district court's jury instructions did not constructively amend the indictment.

4. Sufficiency of the Evidence

The Appellants also contend that the government failed to prove that Seher intended to conceal or disguise the origin of the proceeds used in the money laundering at Chaplin's and Midtown. They thus assert that there was insufficient evidence to sustain their convictions on Counts Two, Four, and Six. Their argument focuses exclusively on the failure to prove a violation of § 1956(a)(3)(B). However, these counts all allege violations of both § 1956(a)(3)(B) and § 1956(a)(3)(C). Since we have found that these subsections represent alternative intents for the same offense, their convictions would be sustained if there was

34

sufficient evidence to support either intent. The Appellants do not contend that there was insufficient evidence that they acted in violation of § 1956(a)(3)(C), i.e., with the intent to avoid a transaction reporting requirement, and the record is replete with proof that Seher had such intent for each of the transactions cited in Counts Two, Four, and Six.[22] Accordingly, we find that there was sufficient evidence to support the jury's verdict for those three counts. We therefore affirm the Appellants' convictions on those counts.

B. Issues Regarding Count One

1. Sufficiency of the Evidence

Seher contends that there was insufficient evidence to sustain his Count One conviction for conspiracy to launder money. He asserts that the evidence established that he had a buyer-seller relationship with his customers at the Depot and did not show that he entered into a conspiratorial agreement to conceal and disguise cocaine proceeds. According to Seher, the district court erred by failing to address this argument as part of his motion for judgment of acquittal. He also asserts that, to the extent that the evidence established an intent to avoid the requirement to file a Form 8300, there was no evidence that such transactions

---

[22] Though this finding is dispositive of the sufficiency of the evidence issue, we note that the record also contains sufficient evidence to support a violation of § 1956(a)(3)(B). From the evidence at trial, the jury could clearly infer that Seher's actions showed an intent to conceal or disguise the proceeds from a specified unlawful activity in all three transactions.

occurred within the relevant statute of limitations period. As such, there would have been insufficient evidence to support his conviction on Count One.

We review a district court's denial of a motion for judgment of acquittal de novo. See United States v. Evans, 473 F.3d 1115, 1118 (11th Cir. 2006). "When the motion raises a challenge to the sufficiency of the evidence, we review the sufficiency of the evidence de novo, drawing all reasonable inferences in the government's favor." Id. (quotation marks and citation omitted). We will affirm the denial by concluding that a reasonable factfinder could find that the evidence established that the defendant was guilty beyond a reasonable doubt. See id.

"To support a conviction of conspiracy, the government must prove [1] that an agreement existed between two or more persons to commit a crime and [2] that the defendants knowingly and voluntarily joined or participated in the conspiracy." United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005) (quotation marks and citation omitted). The government can show the existence of such an agreement via circumstantial evidence, which would include making inferences based on the conduct of those allegedly involved in the scheme. See id. A defendant is deemed to have knowledge of the illegal agreement if he was aware of the primary purpose of the conspiracy. See id.

36

Federal law sets the statute of limitations for conspiracy charges under § 1956(h) at five years. See 18 U.S.C. § 3282(a). "The government satisfies the requirements of the statute of limitations for a non-overt act conspiracy if it alleges and proves that the conspiracy continued into the limitations period." United States v. Arnold, 117 F.3d 1308, 1313 (11th Cir. 1997); see also Whitfield v. United States, 543 U.S. 209, 219, 125 S. Ct. 687, 694 (2005) (holding that § 1956(h) does not require proof of an overt act). "[A] conspiracy is deemed to continue as long as its purposes have neither been abandoned nor accomplished, and no affirmative showing has been made that it has terminated." Arnold, 117 F.3d at 1313.

Count One alleged that Seher conducted a financial transaction with two disjunctive intents — "to conceal and/or disguise the nature, location, source, ownership and control of the proceeds of the said unlawful activity and/or to avoid transaction reporting requirements under federal law" — with the unlawful activity in question being the distribution of cocaine. R1-31 at 1–2. The government obtained the initial indictment on 25 July 2006. Accordingly, we need to determine whether there was sufficient evidence that Seher knowingly entered into a conspiracy with either of those purposes and that the conspiracy continued on or beyond 25 July 2001.

We find that there was ample evidence in the record to support the conclusion that Seher acted with both of those intents. Ragland, Johnson, McDowell, and Manning all testified that Seher never requested that they complete a Form 8300 nor asked for information that would have helped him complete one, even though they all made multiple cash purchases in excess of $10,000. Additionally, Seher and many of these witnesses were aware of the requirement to file a Form 8300, and the witnesses testified that they would not have shopped at the Depot if Seher had made them complete such a form. The jury would have been reasonable in inferring from this evidence that the parties had an agreement to avoid reporting requirements and that Seher voluntarily acted with the intent to evade those requirements.

There was likewise sufficient evidence from which a jury could reasonably infer an intent to disguise drug proceeds. Both Manning and Johnson testified that they purchased jewelry from Seher after that date, though the purchase prices did not exceed $10,000. Furthermore, Manning and Ragland discussed how Seher assisted them in obtaining jewelry that authorities had seized as part of their arrests on drug-related charges, and Johnson testified that Seher agreed to help him sell a watch. In fact, Ragland and Johnson explicitly requested Seher's help, and he agreed to aid them. Furthermore, both Ragland and Manning testified that Seher

38

was aware of their arrests before they ever broached the topic. Though Seher correctly notes that the witnesses all testified that they never told him that they were involved in the drug business or that they were spending drug proceeds, the jury could have reasonably assumed from circumstantial evidence that Seher had such knowledge. Additionally, the witnesses all stated that they made their purchases with cash rolled into thousand-dollar increments, which they typically carried around in plastic bags or shoe boxes, the same manner in which they transported their drug proceeds. Most importantly, Seher continued to help them after they had been charged with drug-related crimes and even expressed a belief to an FBI official that Ragland was involved in the drug trade.

The government also put forth sufficient evidence that the conspiracy continued on or beyond 25 July 2001. Manning, Ragland, and Johnson all testified that their interactions with Seher were not limited merely to individual purchases, but extended to his permitting them to return their purchased jewelry later on, which he would then attempt to sell and give them money in return. The jury could have reasonably inferred that the conspiracy encompassed the totality of these dealings, and that these dealings reflected the dual intents of evading reporting requirements and disguising drug proceeds. Given this understanding of the nature of the conspiracy, Johnson's February 2002 request for Seher's

assistance in selling the Rolex, along with Seher's subsequent payment of funds to Johnson and his sister, would have constituted part of the conspiracy. Accordingly, although there were no sales in excess of $10,000 after July 2001, it was reasonable to view the conspiracy as continuing into the limitations period.

We therefore reject Seher's contention that he had merely a buyer-seller relationship with his customers.[23] We conclude that there was sufficient evidence for a reasonable juror to find that Seher entered into a conspiracy to launder drug proceeds with the intent of both avoiding transaction reporting requirements and concealing or disguising drug proceeds. There was also ample proof from which a reasonable juror could find that the conspiracy continued past 25 July 2001. Accordingly, the district court did not err in rejecting Seher's motion for judgment of acquittal on these grounds.

2. Material Variance

Seher contends that there was a material variance between the crime charged and that proven at trial because the evidence showed that there were multiple conspiracies, rather than a single conspiracy. He believes that the evidence reflected the kind of "rimless wheel" or "hub-and-spoke" conspiracy described in

_____

[23] Seher also incorrectly asserts that the district court did not address this argument. The district court's conclusion that there was sufficient evidence to support Seher's conviction on Count One implicitly rejected his theory.

40

Kotteakos v. United States, 328 U.S. 750, 755, 66 S. Ct. 1239, 1243 (1946) and

United States v. Chandler, 388 F.3d 796, 807 (11th Cir. 2004).  Both of those

courts reversed convictions because that type of conspiracy constituted a material

variance from the indictment, and Seher urges us to reach the same result here.

"A material variance between an indictment and the government's proof at

trial occurs if the government proves multiple conspiracies under an indictment

alleging only a single conspiracy."  Castro, 89 F.3d at 1450.  "We will uphold the

conviction unless the variance (1) was material and (2) substantially prejudiced the

defendant."  Id.  To determine whether a variance was material, we look at the

evidence in the light most favorable to the government and ask whether a

reasonable trier of fact could have determined beyond a reasonable doubt that a

single conspiracy existed.  See United States v. Moore, 525 F.3d 1033, 1042 (11th

Cir. 2008).  We will not disturb the jury's finding of a single conspiracy if it is

supported by substantial evidence.  See id.  Only after making the finding of

material variance do we need to examine whether the variance substantially

prejudiced the defendant.  See United States v. Richardson, 532 F.3d 1279, 1284

(11th Cir. 2008).

"To determine whether the jury could have found a single conspiracy, we

consider:  (1) whether a common goal existed; (2) the nature of the underlying

41

scheme; and (3) the overlap of participants." United States v. Edouard, 485 F.3d 1324, 1347 (11th Cir. 2007) (quotation marks and citation omitted). The government must establish interdependence amongst the co-conspirators. See id. The existence of separate transactions does not have to imply separate conspiracies if the co-conspirators acted "in concert to further a common goal." Chandler, 388 F.3d at 811 (emphasis in original). "Courts typically define the common goal element as broadly as possible," with "common" being "defined as 'similar' or 'substantially the same.'" Moore, 525 F.3d at 1042. "If a defendant's actions facilitated the endeavors of other coconspirators, or facilitated the venture as a whole, then a single conspiracy is shown." Chandler, 388 F.3d at 811 (quotation marks, alteration, and citation omitted, emphasis in original). Each co-conspirator thus does not have to be involved in every part of the conspiracy. See Moore, 525 F.3d at 1042.

After reviewing the record, we find that there was substantial evidence to support the jury's single conspiracy finding. The evidence indicated that the jewelry transactions between Seher and the drug dealers were all done with the common goals of avoiding filing Form 8300s and disguising drug proceeds. The government showed that Seher deliberately ignored transaction reporting requirements and that the dealers continued to come to him because they also

42

wanted to avoid these requirements. Ragland, Johnson, Manning, and McDowell all expressed a desire to purchase jewelry without leaving a paper trial, with the first three also indicating that they would not have purchased jewelry from Seher if he had made them fill out Form 8300s. Taking the evidence in the light most favorable to the government, there was also substantial proof that Seher sold jewelry to help conceal drug proceeds. Witness testimony demonstrated that Seher had established a scheme whereby drug dealers could purchase jewelry from him using cash from drug sales. As part of this same scheme, he also generally agreed to let the dealers return their jewelry, which he would then attempt to resell and, in effect, convert their purchased jewelry back into cash whenever they were in need of it. Furthermore, the evidence indicated that Seher was aware that he was interacting with drug dealers and that the money being used to purchase the jewelry came from drug sales.

There was likewise substantial evidence of a single conspiracy based on the nature of the underlying scheme and the overlap of participants. The set patterns and practices engaged in by Seher and the drug dealers during jewelry purchases at the Depot show the commonality of purpose expected of a single conspiracy. Ragland, Johnson, Manning, and McDowell all testified that Seher required them to complete large transactions in the back room, that he regularly stated coded or

incorrect prices for the jewelry, that he never inquired about the source of their cash, and that he failed to request information to complete Form 8300s. These elements all support the notion that there was a scheme, established by Seher, deliberately designed to avoid transaction reporting requirements and conceal the nature of the funds being used to purchase the jewelry. Furthermore, the participants in the scheme had a great deal of overlap. Many of the dealers knew each other, and they often suggested that fellow dealers should come to the Depot to purchase jewelry. For example, McDowell testified that one of his first visits to the Depot was with Johnson. The dealers were thus aware that others they knew were participating in the scheme.

We also disagree with Seher's contention that the money laundering involved a "rimless wheel" conspiracy similar to those described in Chandler and Kotteakos. A "rimless wheel" conspiracy is a variation of the "hub-and-spoke" model, in which the individual at the "hub" of the conspiracy interacts separately with those along the various "spokes" of the wheel. See Chandler, 388 F.3d at 807. Such a structure would constitute a single conspiracy when the various spokes are aware of each other and of their common aim. See id. at 808. However, "where the 'spokes' of a conspiracy have no knowledge of or connection with" the other "spokes" and "deal[] independently with the hub conspirator, there

44

is not a single conspiracy, but rather as many conspiracies as there are spokes." Id. at 807. This type of multiple conspiracy is akin to "a 'rimless wheel' because there is no rim to connect the spokes in a single scheme." Id. In Chandler, we found that the evidence reflected the latter kind of arrangement because the central conspirator was the only individual who moved from spoke to spoke or who even knew about the other spokes or the overall scheme. See id. at 808. In contrast, the drug dealers here knew that they could purchase jewelry from Seher without having to follow federal reporting requirements and then exchange it back when needed. They were aware that their fellow drug dealers were purchasing goods from Seher for the same purpose, and they even encouraged others to do likewise.[24] There was thus substantial evidence that the co-conspirators were aware of the nature and scope of Seher's scheme, thereby distinguishing this situation from the rimless wheel discussed in Chandler and Kotteakos. Accordingly, we find that the jury's finding of a single conspiracy was supported by substantial evidence.[25] We

---

[24] Some drug dealers appear to have assisted Seher in obtaining payment from delinquent purchasers. For instance, Johnson testified that Seher asked him to contact particular drug dealers on his behalf.

[25] Furthermore, we note that, even if there had been a material variance, Seher would not have been substantially prejudiced by it because the proof at trial did not differ so greatly from the charges so as to surprise him unfairly or impair his ability to prepare an adequate defense, nor were there "so many defendants and separate conspiracies before the jury that there [was] a substantial likelihood that the jury transferred proof of one conspiracy to a defendant involved in another." Richardson, 532 F.3d at 1287 (quotation marks and citation omitted).

45

therefore conclude that there was no material variance regarding Count One and affirm Seher's conviction on that count.[26]

C. Issues Related to the Forfeiture Order

1. Forfeiture of Bank Accounts and Inventories

Chaplin's and Midtown contend that the district court erred in ordering forfeiture of their bank accounts and inventories because they did not constitute properties involved in, or used to facilitate, the offenses charged in Counts Two through Seven. Specifically, they maintain that there is no connection between these properties and the money laundering offenses. They also emphasize that, apart from the undercover sales, there was no proof of any other illegal activities taking place at the Chaplin's and Midtown stores

"We review de novo the district court's legal conclusions regarding forfeiture and the court's findings of fact for clear error." Puche, 350 F.3d at 1153. A person convicted of violating 18 U.S.C. § 1956 and 31 U.S.C. § 5324 must forfeit to the government all property that is either "involved in" that violation or traceable thereto. 18 U.S.C. § 982(a)(1); 31 U.S.C. § 5317(c)(1)(A). Property eligible for forfeiture under 18 U.S.C. § 982(a)(1) includes that money or property

---

[26] Seher asserts that we should vacate his sentence on Counts Three, Five, and Seven and remand for a new sentencing hearing. He concedes, however, that this argument would only be applicable if we vacate his convictions on Counts One, Two, Four, and Six. Since we have affirmed his convictions on those counts, we need not address his resentencing argument.

46

which was actually laundered ("the corpus"), along with "any commissions or fees paid to the launderer[] and any property used to facilitate the laundering offense." Puche, 350 F.3d at 1153 (quotation marks and citation omitted). Property would facilitate an offense if it "makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." Id. (quotation marks and citation omitted). Though the pooling or commingling of tainted and untainted funds would not by itself render the entirety of an account subject to forfeiture, if the government establishes that the defendant did so "to facilitate or 'disguise' his illegal scheme," then forfeiture is acceptable. Id.

Chaplin's and Midtown first contend that we should not interpret § 5317(c)(1)(A) to allow for forfeiture of property used to facilitate the transaction reporting violation. See 31 U.S.C. § 5317(c)(1)(A). In support of their argument, they cite United States v. Dean, 87 F.3d 1212, 1213–14 (11th Cir. 1996), in which we noted that the amount forfeitable in a case would be limited to that money which was directly involved in the reporting offense. However, we conclude that discussion in Dean to be inapposite and not controlling here. In Dean we were dealing with a separate and distinct issue, the legality of a civil forfeiture agreement — a question that involved determining whether § 5317 was a remedial or punitive statute. In answering this question, we never addressed whether

47

facilitation of the offense was a valid interpretation of § 5317, instead focusing on the nature of the statute itself. See Dean at 1213–14. Furthermore, Dean was addressing an old version of § 5317, which included no mention of the current version's phrase "involved in." See id. at 1213. The "term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate the offense." United States v. Varrone, 554 F.3d 327, 331 (2d Cir. 2009) (quotation marks and citation omitted).

Because Dean does not affect our analysis, we instead focus on the similarity between the relevant language of § 5317(c)(1)(A) and § 982(a)(1). Section § 5317(c)(1)(A) requires "the defendant to forfeit all property, real or personal, involved in the offense and any property traceable thereto," whereas § 982(a)(1) states "that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1); 31 U.S.C. § 5317(c)(1)(A). Given that the two statutes essentially mirror each other, it seems incongruous to interpret those provisions as covering different arrays of property. Cf. Varrone, 554 F.3d at 330–31 (noting that the two provisions have "nearly identical" language and that the broad interpretation of "involved in" applies equally to § 5317(c)(1)(A) and § 982). Furthermore, we can discern no policy basis for distinguishing between the two. Accordingly, we

48

conclude that § 5317(c)(1)(A) allows for forfeiture of property that facilitates the reporting violation.

Chaplin's and Midtown next assert that forfeiture of their accounts and inventories was improper because there was no evidence that they were used in the commission of those violations. This contention ignores the fact that the availability of the two stores' inventories made it easier for Seher to launder money by giving potential buyers a large variety of jewelry options. Furthermore, Seher used telephones, business cards, and other company property to create a facade of legitimacy, which aided in the concealment of his actions. See United States v. Rivera, 884 F.2d 544, 546 (11th Cir. 1989) (deeming defendant's horse breeding business a "front" for his drug trafficking and thus permitting forfeiture of horses under facilitation theory). Both stores' inventories thus facilitated the offenses, and the district court properly included them in the forfeiture order. For much the same reason, we also find that the district court did not err in including Midtown's bank account. The evidence established that the cash from Perkins' last two purchases was deposited in Midtown's bank account, thereby further facilitating the laundering by disguising the source of those tainted funds. See Puche, 350 F.3d at 1154 (deeming it reasonable to infer that the intermingling of tainted and

49

legitimate proceeds "act[ed] as a 'cover' and hence reduced suspicion of" the source of the tainted funds).

We can identify no evidence in the record, however, linking a Chaplin's bank account to the reporting and laundering offenses. There were no deposit slips or account statements showing that Perkins' cash was deposited in a Chaplin's account, nor were there any references to payments being deposited into a Chaplin's bank account. In fact, the record does not disclose the name of Chaplin's bank account or even mention that a Chaplin's account exists, other than in general references to accounts apparently held by Chaplin's. The government provides no record cites to a specific Chaplin's bank account. Instead the government focuses on the interconnectedness between Chaplin's and Midtown and asserts that all of the assets of both companies, including their bank accounts, were thereby involved in the offenses. It also notes that some Midtown employees occasionally worked at Chaplin's and often were paid in cash. Though this latter fact could support the inference that Perkins' cash was used to pay employees, it would not tie the cash to a Chaplin's bank account. Additionally, the district court made no specific findings regarding whether Chaplin's and Midtown should be treated as one entity. Unless such a finding is made, we cannot view the two companies as sharing assets for forfeiture purposes. See United States v. Gilbert,

50

244 F.3d 888, 919 (11th Cir. 2001) (noting that criminal forfeiture reaches only those assets owned by a particular defendant).

Instead, the court found that the proceeds from the offenses went back into both Chaplin's and Midtown via bank deposits and cash payments. Though property need not be used exclusively for illegal activities to be forfeitable, it "must have more than an incidental or fortuitous connection to criminal activity." United States v. Schifferli, 895 F.2d 987, 990 (4th Cir. 1990). As a result, there must be evidence that some part of the property was used for illegal activities. Since we can identify no evidence to support the district court's finding as it pertains to Chaplin's bank accounts, we find that the district court clearly erred on that point.[27] See United States v. Bornfield, 145 F.3d 1123, 1138 (10th Cir. 1998) (concluding that jury verdict ordering forfeiture of defendant's business account in money laundering case constituted clear error when the record showed that all of the laundered funds went to his personal account and that there was no connection between his business account and the laundering offense). Accordingly, we find that the district court did not err in ordering forfeiture of the inventory of both

[27] This conclusion should not be read as implying that these accounts could not be part of a forfeiture order, but rather that the district court failed to support its finding with sufficient evidence. On remand, the district court should address whether forfeiture is supported by a preponderance of the evidence, taking into account any and all evidence put forth at trial, even on the conspiracy counts. See United States v. Hasson, 333 F.3d 1264, 1279 (11th Cir. 2003).

51

companies and of Midtown's bank account; however, we vacate that part of its order forfeiting any bank accounts of Chaplin's and remand for further hearing to address whether the evidence supports such a forfeiture.

2. Eighth Amendment Violation

Chaplin's and Midtown also contend that the forfeiture of their bank accounts and inventories constituted an excessive fine in violation of the Eighth Amendment. We review de novo the issue of whether a forfeiture order would be constitutionally excessive under the Eighth Amendment. See Puche, 350 F.3d at 1153. Since the forfeiture order here occurred at the end of a criminal proceeding and was imposed solely because of a criminal conviction, it would constitute a fine that would be subject to the Eighth Amendment's prohibition of excessive fines. See Browne, 505 F.3d at 1281–82.

A forfeiture order violates the Excessive Fines Clause if it "is grossly disproportional to the gravity of a defendant's offense." United States v. Bajakajian, 524 U.S. 321, 337, 118 S. Ct. 2028, 2038 (1998). To make this determination, we principally look at three factors: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." Browne, 505 F.3d at 1281. We do not take

52

into account the impact the fine would have on an individual defendant.  See

United States v. 817 N.E. 29th Drive, Wilton Manors, Fla., 175 F.3d 1304, 1311

(11th Cir. 1999).  In addition, "if the value of forfeited property is within the range

of fines prescribed by Congress, a strong presumption arises that the forfeiture is

constitutional."  Id. at 1309.

The district court never addressed whether the forfeiture order violated the

Eighth Amendment, even though Chaplin's and Midtown raised it in their

opposition brief.  It also made no findings regarding the value of the forfeited

properties — a particular problem since the parties cite widely divergent figures.

The government, relying on a pleading filed by Chaplin's and Midtown, asserts

that the collective value of the two properties is approximately $3 million.[28]

Chaplin's and Midtown, on the other hand, claim in their brief on appeal that the

properties are worth a total of $7 million.  Based on 18 U.S.C. § 3571 and 31

U.S.C. § 5324, Chaplin's and Midtown would have been eligible for $1.5 million

---

[28] The pleading the government cites is itself contradictory.  The text lists the total for both stores as $3 million, but a footnote states that Chaplin's inventory is worth $2-2.5 million and Midtown's about $1.5 million.

and $3 million, respectively, in total fines for their offenses.[29]  See 18 U.S.C.

§ 3571(c)(3); 31 U.S.C. § 5324(d)(2).

We therefore do not have a clear factual basis for evaluating whether the

forfeiture of the accounts and inventories would be an excessive fine, especially

since we are vacating the district court's order vis-a-vis Chaplin's bank accounts.

As a result, we believe that the issue would be better addressed by the district court

in the first instance and therefore remand so it can examine the Eighth Amendment

issue solely as to the accounts and inventories.  See United States v. Land, Winston

County, 163 F.3d 1295, 1303 (11th Cir. 1998) (deeming remand of previously

unaddressed excessive fine issue proper "[b]ecause the issue of excessive fines

may depend on various factors and conduct with which the district court is more

familiar").  Accordingly, although we find no error regarding the forfeiture order

insofar as it encompassed the inventories of Chaplin's and Midtown and the bank

accounts of Midtown, since the district court had not addressed the Eighth

Amendment question, we also vacate those parts of the order.

3. Personal Money Judgments

---

[29] The normal statutory maximum fine for a corporation found guilty of a felony is $500,000 per offense.  See 18 U.S.C. § 3571(c)(3).  However, 31 U.S.C. § 5324 permits this maximum to be doubled when a violation of that section is coupled with a violation of a different statute, such as 18 U.S.C. § 1956(c)(3).  See 31 U.S.C. § 5324(d)(2).  Chaplin's would thus be eligible for a $500,000 fine on Count Two and a $1 million fine on Count Three, and Midtown would be eligible for a $500,000 fine on Counts Four and Six and a $1 million fine on Counts Five and Seven.

54

Chaplin's, Midtown, and Seher all challenge the personal money judgment entered against them regarding Counts Two through Seven. Chaplin's and Midtown both concede that they would be eligible for money judgments of $22,000 and $32,800, respectively. However, they argue that the district court erred by making them jointly liable, along with Seher, for a money judgment of $54,800.[30]

We agree with the government that the judgment would be acceptable if we pierced the corporate veil and deemed Chaplin's and Midtown the functional equivalent of a single corporation. However, as previously noted, the district court made no findings regarding whether Chaplin's and Midtown constituted one entity for the purpose of imposing joint and several liability. Furthermore, though courts have affirmed forfeiture orders imposing joint and several liability, those cases appear to involve offenses from which such liability would logically derive, such as conspiracy or aiding and abetting. See, e.g., United States v. Spano, 421 F.3d 599, 603 (7th Cir. 2005) (conspiracy); United States v. Pitt, 193 F.3d 751, 765 (3d Cir. 1999) (conspiracy); United States v. Benevento, 836 F.2d 129, 130 (2d Cir.

_____

[30] In their initial brief, they also appear to challenge the district court's authority to enter personal money judgments in general. However, we have since explicitly rejected this argument in a subsequent case. See United States v. Padron, 527 F.3d 1156, 1162 (11th Cir. 2008) (noting that the district court has the authority to enter a money judgment in a criminal forfeiture case based on a combination of 28 U.S.C. § 2461(c) and Federal Rule of Criminal Procedure 32.2).

1988) (per curiam) (criminal enterprise).  The district court imposed the $54,800

money judgment for the Appellants' money laundering and failure to follow

reporting requirements, neither of which are the types of offenses for which joint

and several liability would be appropriate.  In the absence of any clear authority or

factual basis for affirming the money judgment against Seher, Midtown, and

Chaplin's, we therefore vacate that portion of the forfeiture order and remand for

further findings which address whether joint liability is appropriate or whether the

corporate veil should be pierced.

4. Forfeiture of Substitute Assets

Seher asserts that the district court erred in finding that his real property

could be a substitute asset under 21 U.S.C. § 853(p) for the $1,610,400 laundered

in connection with the drug conspiracy charged in Count One.  He argues that

these funds were the property of the Depot, not him, and that he therefore had no

interest in this property and should be deemed an "intermediary" to the conspiracy,

who could not be subject to a money judgment.  He also contends that the

government failed to prove that he caused this property to be unavailable via an act

or omission on his part.

Both of these arguments fail.  The evidence at trial established that the

laundered funds were originally given to Seher, and there was no indication that

56

they ever became the property of the Depot. Furthermore, as he was convicted of conspiracy to launder money, it is reasonable to hold him liable for all the proceeds that were a reasonably foreseeable result of that conspiracy regardless of whether he still possesses them. See United States v. Caporale, 806 F.2d 1487, 1506–09 (11th Cir. 1986) (affirming forfeiture order imposing joint and several liability on RICO conspirators based on this rationale); see also United States v. Reiner, 500 F.3d 10, 18 (1st Cir. 2007) (affirming forfeiture order holding single conspirator vicariously liable for the total value of the conspiracy). Seher also asserts that he was merely an "intermediary" to these financial transactions, as defined in 18 U.S.C. § 982(b)(2), and therefore would be ineligible for a money judgment. That statute defines an intermediary as an individual "who handled but did not retain the property in the course of the money laundering offense." 18 U.S.C. § 982(b)(2). However, an individual would not be an intermediary if, "in committing the offense or offenses giving rise to the forfeiture, [he] conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period." Id. There was evidence that Manning made at least $200,000 in purchases on a single day in 1998 and that Johnson and McDowell also made purchases that same year. Seher therefore would not be an intermediary under the

statute regardless of whether he "handled but did not retain" the money involved in the laundering.

Seher is likewise in error in asserting that the government failed to provide proof that his actions or omissions triggered the substitute asset provision. As part of the government's motion for a preliminary forfeiture order, it attached a declaration from an IRS Special Agent involved in the case stating that, based on the government's attempts to locate the missing proceeds, Seher had "dissipated or otherwise disposed of the proceeds of his crimes." R4-155, Exh. B at 2. Though the affidavit did not identify every effort the government had made to obtain the proceeds, we find it sufficiently specific in identifying Seher's acts and omissions for the district court to rely on it as the basis for ordering forfeiture under the substitute asset provision. We note that the First Circuit made a similar finding based on a government affidavit that used virtually the same language regarding the defendant's actions. See United States v. Candelaria-Silva, 166 F.3d 19, 42 (1st Cir. 1999). The district court therefore did not err in finding that Seher's property could be a substitute assert for the personal money judgment on Count One.

## III. CONCLUSION

Seher, Chaplin's, and Midtown appeal their convictions and sentences for various money laundering and transaction reporting offenses, as well as the district court's forfeiture order. Counts Two, Four, and Six of the indictment properly stated claims, were not duplicitous, and were not constructively amended by the district court in the jury charge. There was also sufficient evidence to support the Appellants' convictions on those counts. Additionally, as to Count One, there was sufficient evidence that Seher entered into a single conspiracy that continued into the relevant statute of limitations period. The district court also did not err in ordering forfeiture of Midtown's inventory and bank accounts as well as Chaplin's inventory, nor did it err in imposing a $1,610,400 money judgment against Seher or in ordering forfeiture of his real property as a substitute asset. However, the district court clearly erred in making factual findings regarding Chaplin's bank accounts. It also failed to address whether the forfeiture of the two companies' inventories and bank accounts constituted an excessive fine under the Eighth Amendment. Finally, the court did not justify the imposition of joint liability on Chaplin's, Midtown, and Seher for the $54,800 money judgment on Counts Two through Seven. We therefore AFFIRM all of the Appellants' convictions as well as those portions of the district court's forfeiture order imposing the $1,610,400 money judgment against Seher and ordering forfeiture of Seher's real property as a

59

substitute assert.  We VACATE the district court's order insofar as it ordered forfeiture of the accounts and inventories of Chaplin's and Midtown and imposed a $54,800 money judgment against Chaplin's, Midtown, and Seher and REMAND for further action on those portions of the forfeiture order.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART**.