[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-12534
Non-Argument Calendar

_____

D.C. Docket No. 1:10-cr-20672-KMM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LAWRENCE PEREZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 22, 2014)

Before ED CARNES, Chief Judge, and RESTANI,[*] Judge, and ROBRENO,[**] District Judge.

_____

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by designation.

[**] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

PER CURIAM:

Lawrence Perez is a former detective with the Hialeah Gardens Police Department. Over the course of several months, he used his authority as a police officer to help his drug-dealing friend procure and transport marijuana. In return he received a share of the profits that his friend made when the marijuana was sold. An FBI investigation led to Perez's arrest, and a jury eventually convicted him of conspiring and attempting to possess marijuana with the intent to distribute. He was sentenced to 151 months imprisonment for his crimes. This is his appeal.

## I.  Facts

Around 1996 or 1997 and before he became a police officer, Perez met Carlos Santurtun Teran and the two men became close friends.[1] Over the course of their friendship, Perez learned that Teran was a convicted felon who was making money as a marijuana dealer. The two men maintained their friendship after Perez became a police officer, and Teran continued to tell Perez about his deals buying and selling marijuana. At some point during their relationship, Perez told Teran that he could "count on him" to help with "whatever [Teran] needed him to do" to further his marijuana deals, so long as Perez "could make some money." Perez offered to help Teran because he needed money to pay child support. He also

---

[1] Because there are sufficiency of the evidence challenges, we set out the facts in some detail.

needed money to pay for the house where his ex-wife and child lived, as well as the apartment where he lived with his girlfriend.

A.  Perez and Others Steal Ten Pounds of Marijuana from a Drug Dealer

In March 2010 Perez, Teran, and two other men — Wilfredo Gonzalez Arce and Javier Lopez — devised a plan to steal ten pounds of marijuana from Danny Zequiera, an acquaintance of Lopez.  Teran proposed to the group that they could steal the marijuana by having Perez perform a traffic stop of the car that Zequiera would be traveling in with the marijuana.

Pursuant to the plan, Lopez told Zequiera that Arce had a buyer for his marijuana, and Zequiera met Arce at Lopez's house to bring the drugs to Arce's buyer.  Zequiera placed the marijuana in Arce's car, and the two of them drove together toward Miami Beach to meet the alleged buyer.  On the way to Miami Beach, Arce drove past an intersection where Perez was waiting in an unmarked police car.  At that intersection, Arce intentionally ran a stop sign and Perez pulled the car over.  After Arce and Zequiera gave Perez their drivers' licenses, Perez asked for Arce's consent to search the car because he said he smelled "a bad odor" inside the car.  Arce consented to the search, and Perez "discovered" Zequiera's marijuana when he opened the trunk of the car.  Arce told Perez that the marijuana belonged to him, and Perez allowed Zequiera to leave because Arce had claimed responsibility for the marijuana.  Perez cuffed Arce and placed him in his police

3

car.  In the meantime, Teran, who was nearby in his car, called for a tow truck to come get Arce's car.  Perez began driving toward the jail with Arce in case he was being followed, but he soon changed course and drove to Teran's house.

After Zequiera, Arce, and Perez left the scene of the traffic stop, Zequiera retrieved his car from Lopez's house and returned to the scene of the stop.  He saw the tow truck taking away the car and he followed the truck, eventually ending up at Teran's condo.  He made his way inside and confronted Arce, Teran, and Perez about the theft.  Although Perez "wanted to shoot" Zequiera, Teran defused the tension and convinced Zequiera to come back the next day for his marijuana.  But Teran never returned the marijuana, telling Zequiera that "the policeman [did not] want to give it" back.  Teran eventually sold the marijuana for $33,000 and split the proceeds between himself, Arce, and Perez.

More than a month after the conspirators stole Zequiera's marijuana, Teran and Perez met with Eric Diaz, one of Teran's associates, to plan a "rip" of a woman who was driving from New York to Broward County with a large amount of money to purchase marijuana.[2]  Diaz was an FBI informant, and he recorded the conversation he had with Teran and Perez.  During the conversation, Teran and Perez told Diaz about how they had ripped off Zequiera.  Teran recounted how Perez "was going to shoot" Zequiera until Teran "got in the middle and told him

---

[2] Throughout Perez's trial, the conspirators' planned thefts were colloquially referred to as "rips" or "rip offs."

not" to do it.  Perez confirmed Teran's version of events, responding with comments such as "[n]o kidding bro" and "I swear to God, bro."  Perez also said to Diaz:  "I'd kill him bro, we needed [the marijuana] so badly."

B.  Perez, Teran, and Arce Steal 14 Pounds of Marijuana from Drug Dealers

In May 2010 Arce learned that one of his father's friends was looking to sell 14 pounds of marijuana.  He set up a meeting with Teran and Perez, and the three men agreed that Perez would perform another phony traffic stop so they could steal the marijuana from the seller, just as they had done with Zequiera.  Following through with the plan, Arce met with the seller on May 24 at a prearranged location and told the seller that he would lead him to the buyer.  Perez, who was dressed in his police uniform and waiting nearby in his police car, followed Arce and the seller.[3]  He eventually pulled over the seller's car and brought 14 pounds of marijuana to Teran's house after the stop.  Teran then sold the drugs and divided the proceeds between himself, Perez, and Arce.  Perez's share was $17,600.

C.  Teran Transports Marijuana with Perez Serving as an Escort

Jesus Mancha Guerra, a marijuana grower, was one of Teran's suppliers.  On July 10, 2010, Teran went to the home of Guerra's cousin to pick up 35 pounds of marijuana that he had purchased from Guerra.  When Teran arrived to pick up the

---

[3] Hialeah Gardens police records indicate that Perez was not on duty on May 24 and that he did not report any property seizures on that date.

5

drugs, he called Perez and asked him to come escort him while he was driving with the marijuana, explaining that he wanted Perez to protect him and his illicit cargo "from any person who might try to rip us off or [from] some police officer who might stop us."[4]  Perez came to the house and left with Teran, following his friend's car until Teran felt safe enough for Perez to leave.

Ten days later, on July 20, 2010, Teran went back to Guerra's cousin's house and bought about 40 pounds of marijuana.  He called Perez and again asked his friend to escort him while he was transporting the marijuana.[5]  Perez agreed to help, and he drove to the cousin's house and followed Teran while he was driving with the drugs in his car.  For his assistance on those two occasions, Teran paid Perez about $1,400.

D.  Teran, Perez, and Others Plan to Steal Marijuana Plants from a Warehouse

On July 25, 2010, Guerra spoke over the phone with Teran about a "huge" warehouse where he knew marijuana was being grown.  Guerra and Teran discussed robbing the warehouse, but Guerra said that it would be a difficult job because the warehouse doors were "very strong" and made of metal.  He also mentioned that the people inside were armed.  Teran proposed that they could overcome those problems with the help of Perez, whom Teran called his "ace."

---

[4] The conversation was recorded by the FBI, which had a wiretap on Teran's phone, and played before the jury at Perez's trial.

[5] This conversation was also recorded by the FBI and played for the jury at trial.

Teran suggested that they could have Perez, acting as a police officer, knock on the warehouse door, which would cause the occupants to run away. The coconspirators would then be able to safely go into the warehouse and take the marijuana plants and other drugs that were inside. The next day, Teran discussed the planned "rip" of the warehouse with Perez, who agreed to participate in the scheme.[6]

On July 27, Teran and Perez met at a prearranged location and drove together in Perez's car to the warehouse. Relying on an insider who worked at the warehouse, Teran learned which building contained the marijuana plants and where the plants could be found within the structure. Teran and Perez drove past the warehouse two times and a Miami-Dade detective who was monitoring the men observed Perez's car "in front of [the] warehouse for an extended period of time." Perez and Teran then drove to a nearby tow truck yard where they met with other people involved in the scheme and spent 15 to 20 minutes discussing "how the plan was going to go to get into the warehouse and steal the marijuana." At the end of that meeting, the coconspirators agreed to let Perez know when they were ready to execute the plan. Before leaving the area, Perez drove past the warehouse and recorded the license plate number of a truck that was parked in the warehouse yard. He ran the tag number to find out the owner's name and address, which he

---

[6] The discussion was recorded by the FBI and played for the jury at Perez's trial.

7

passed along to Teran. Teran then gave that information to another coconspirator, who said that he would use it to "rob [the owner] at his house" if they could not "get him at the warehouse." In a phone call that same evening, Guerra asked Teran whether Perez thought their plan could work, and Teran replied that Perez said "it [could] be done." Teran told Guerra that he and his associates were waiting to execute the plan because the warehouse owner had not gone home yet. The men did not attempt to invade the warehouse that night because they felt that they "didn't have the final plan yet."

On July 28, the FBI, DEA, and Miami-Dade Police Department raided the warehouse pursuant to a search warrant. Based on their surveillance and monitoring of Teran's calls, the authorities had determined that they did not want to allow the planned theft to proceed because the risk of a violent confrontation was too high. The raid uncovered an extensive marijuana grow operation. In total the authorities recovered 629 marijuana plants, 15.25 kilograms of marijuana that was packaged and ready to be sold, firearms, and a small amount of cocaine. Soon after the raid, one of the coconspirators told Teran that the police had taken the warehouse. Teran then called Perez, who confirmed that police had raided the warehouse. Perez assured Teran however that "he had nothing to do with" the police operation.

### E.  Perez's Arrest

On September 10, 2010, FBI agents arrested Perez.  The agents seized Perez's cell phone, which had Teran's number stored inside.  After receiving Miranda warnings, Perez admitted that he knew Teran but said that his friend had "not done anything illegal in front of him."  He also admitted that he had driven past the warehouse that the police had raided, but he said that he planned to give information about the warehouse to Luis Ledesma, a DEA informant whom he knew.  He told the agents that Teran wanted to steal the marijuana from the warehouse and that he "played along."  He claimed that he played along because he considered Teran a valuable source of information, and he did not want to lose his trust.  A search of Perez's police locker and car uncovered several firearms, $2,600 in cash and jewelry, a plastic bag containing marijuana, and a small scale used to weigh drugs.

### F.  Perez's Prosecution

On September 27, 2011, a federal grand jury returned a second superseding indictment charging Perez with one count of conspiracy to possess a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841 and 846, and one count of attempting to possess a controlled substance with intent to distribute,

9

in violation of the same U.S. Code provisions.[7]  At his trial, Perez testified in his own defense.  He admitted to the jury that he had a close relationship with Teran, but he asserted that he fostered the friendship to advance his long-term career goals.  Perez stated that he wanted "to work with a bigger agency," like the DEA, because he was interested in "do[ing] something bigger" than the type of police work he did with the Hialeah Gardens Police Department.  He testified that he decided to pursue that goal by working on his own as an "undercover operative" because the Hialeah Gardens Police Department did not handle large drug cases. Perez claimed that he wanted to use his friendship with Teran "to [his] advantage to identify" drug dealers, which would enable him to "start building . . . a case that would get [him] notoriety from a different agency."  Perez asserted that that he did not intend to engage in criminal activity.  Instead, he was merely "playing along" with Teran to further his own law enforcement career.

The jury convicted Perez on both counts alleged in the indictment.  It also entered special verdicts indicating that each count involved 100 or more marijuana plants and a detectable amount of marijuana.  The district court sentenced Perez to a concurrent 151-month prison term on each count.

---

[7] In the initial indictment, Teran and Guerra were charged along with Perez.  Those two men pleaded guilty, agreed to cooperate with the government, and testified against Perez at his trial.  Arce was indicted in the second superseding indictment.  He also pleaded guilty and testified against Perez.

## II.  Discussion

Perez challenges his convictions on three grounds.  First, he contends that the government improperly charged him in a duplicitous indictment.  Second, he challenges the sufficiency of the evidence to convict him on the conspiracy and attempt counts.  Third, he contends that his convictions should be reversed because of cumulative error that occurred during his trial.

### A.  Duplicitous Indictment

Perez asserts that his indictment was duplicitous because each count charged him with "two or more separate and distinct offenses."  He contends that the counts were duplicitous because the indictment alleged that he both conspired and attempted to possess "100 or more marijuana plants or a mixture and substance containing a detectable amount of marijuana."  In Perez's view, each count charged him with one crime involving marijuana plants and another crime involving a marijuana substance.

Whether an indictment is duplicitous is a question of law that is ordinarily reviewed de novo.  See United States v. Caldwell, 302 F.3d 399, 407 (5th Cir. 2002).  However, unless he can show good cause, a defendant waives his right to challenge his indictment as duplicitous when he fails to raise the issue before trial.  United States v. Seher, 562 F.3d 1344, 1358–59 & n.15 (11th Cir. 2009); United

States v. Rivera, 77 F.3d 1348, 1352 & n.4 (11th Cir. 1996); United States v.

Creech, 408 F.3d 264, 270 (5th Cir. 2005).

In this case, Perez did not make his duplicity challenge before trial and

instead raises it for the first time on appeal.  He has therefore waived the issue

unless he can show good cause for his failure to raise it before trial.  See Fed. R.

Crim. P. 12(b)(3)(B) (noting that "a motion alleging a defect in the indictment"

must be raised before trial); see also United States v. Barrington, 648 F.3d 1178,

1189–90 (11th Cir. 2011) (noting that a defendant waives a duplicity challenge not

brought before trial unless he can show good cause); Seher, 562 F.3d at 1359

("Generally, a defendant must object before trial to defects in an indictment, and

the failure to do so waives any alleged defects.").  Perez has not explained why he

did not raise the duplicity issue before his trial.  In any event, we find that he

cannot show good cause because he challenges only the indictment's language,

which he had the opportunity to review well before his trial.  See Seher, 562 F.3d

at 1359 n.15 ("Good cause is not shown where the defendant had all the

information necessary to bring a Rule 12(b) motion before the date set for pretrial

motions, but failed to file it by that date."); see also Barrington, 648 F.3d at 1190

(same).  Therefore, Perez has waived his challenge to the indictment.

## B.  Sufficiency of the Evidence

Perez argues that there was insufficient evidence to convict him on both the conspiracy and attempt charges alleged in the indictment.  We ordinarily review de novo "whether sufficient evidence supports a conviction, viewing the evidence and taking all reasonable inferences in favor of the jury's verdict."  United States v. Fries, 725 F.3d 1286, 1291 (11th Cir. 2013).  But when a defendant challenges the sufficiency of the evidence on a ground that was not raised below, he "must shoulder a somewhat heavier burden" on appeal because we will reverse his conviction only if doing so is necessary to prevent a "manifest miscarriage of justice."  Id.; see also United States v. Esquenazi, 752 F.3d 912, 935 (11th Cir. 2014) ("Where the specific grounds upon which a defendant made his sufficiency-of-the-evidence challenge at trial differ from those he asserts on appeal, we review under his new theory only for manifest miscarriage of justice.").  Under that standard, we will not reverse the defendant's convictions unless "the record is devoid of evidence of an essential element of the crime" or "the evidence on a key element of the offense is so tenuous that a conviction would be shocking."  Fries, 725 F.3d at 1291 (quotation marks omitted).

13

### 1. Conspiracy Count

Perez contends that the government presented insufficient evidence for the jury to find that he knowingly joined any conspiracy.[8] Asserting that many of his codefendants had a motive to give false testimony and claiming that the government presented conflicting testimony at trial, Perez asserts that reasonable doubt exists as to whether he was guilty.

We find Perez's argument unpersuasive. Testimony from Teran and the other coconspirators, as well as wiretap recordings played for the jury, overwhelmingly established that Perez knowingly and voluntarily entered into an agreement with others to steal marijuana from various drug dealers during the time period alleged in the indictment. According to the testimony of the government's witnesses, Perez was an active participant in the conspiracy, helping Teran and others to both plan and carry out the drug thefts that took place.

Although Perez takes issue with the testimony of his coconspirators, we are bound to credit their testimony unless it was incredible as a matter of law.[9] E.g.,

---

[8] To convict Perez on the conspiracy count, the government had to prove that "(1) an illegal agreement existed to possess with intent to distribute a controlled substance; (2) [Perez] knew of the agreement; and (3) [Perez] knowingly and voluntarily joined the agreement." United States v. Isnadin, 742 F.3d 1278, 1305 (11th Cir. 2014).

[9] Perez does not argue that his coconspirators' testimony was incredible as a matter of law. And even if he had made that argument, it would not have been convincing because the coconspirators did not testify about events that they did not observe or that could not have possibly occurred. See United States v. Isaacson, 752 F.3d 1291, 1304 (11th Cir. 2014) ("Testimony is incredible as a matter of law only if it concerns facts that the witness physically

United States v. Isaacson, 752 F.3d 1291, 1304 (11th Cir. 2014); United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999) ("To the extent that Appellants' argument depends upon challenges to the credibility of witnesses, the jury has exclusive province over that determination and the court of appeals may not revisit this question."). Doing so is part of our duty to view the evidence in the light most favorable to the jury's verdict. See Fries, 725 F.3d at 1291. In this case, the testimony of Perez's coconspirators provided the jury with more than enough evidence to find that Perez knowingly participated in the charged conspiracy.

In addition, we have said again and again that "a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). As a result, "where some corroborative evidence of guilt exists for the charged offense . . . and the defendant takes the stand in his own defense," his testimony denying guilt may, by itself, establish elements of the charged offense. Id. at 314–15. That principle "applies with special force where the elements to be proved for

could not have possibly observed or events that could not have occurred under the laws of nature.") (quotation marks omitted).

15

a conviction include highly subjective elements: for example, the defendant's intent or knowledge."[10] Id. at 315.

In this case, Perez testified in his own defense and the jury did not believe his testimony. Therefore, we may view his testimony as substantive evidence of guilt. See id. at 314. Because there was other corroborative evidence of Perez's guilt, the jury's rejection of Perez's testimony is sufficient to establish that he was a knowing participant in the charged conspiracy, see id. at 314–15, even without the testimony of his coconspirators.

## 2. Attempt Count

To convict Perez on the attempt count, the government had to prove that Perez "had the specific intent to engage in criminal conduct and that he took a substantial step toward commission of the offense." United States v. Baptista-Rodriguez, 17 F.3d 1354, 1369 (11th Cir. 1994). "A substantial step must be more than remote preparation, and must be conduct strongly corroborative of the firmness of the defendant's criminal intent." United States v. Ballinger, 395 F.3d 1218, 1238 n.8 (11th Cir. 2005) (quotation marks omitted). For the first time on appeal, Perez contends that there was insufficient evidence on the attempt charge

---

[10] Perez also argues that the evidence was insufficient to show that the defendants knew that the warehouse contained over 100 marijuana plants, and thus "attributing to them an intent to possess more than 100 marijuana plants [was] completely speculative." Appellant's Br. at 49–51. Even assuming that Perez's reading of the record is accurate, the government was not required to prove that Perez knew of the type and amount of the controlled substance intended to be distributed. See United States v. Sanders, 668 F.3d 1298, 1309–10 (11th Cir. 2012).

16

because the government failed to show that he took a "substantial step" toward possessing marijuana plants.[11]  He asserts that the evidence showed, at most, that he was merely "planning and fantasizing about raiding a marijuana grow house" at "some future undetermined time."

Perez's argument is reviewable under the "manifest miscarriage of justice" standard because he did not raise it in his Rule 29 motion, but we would find it unconvincing even under de novo review.  The evidence at trial showed that Perez participated in discussions on at least two occasions about how he and his coconspirators were going to steal the marijuana plants from the warehouse.  He also went to the warehouse with Teran, driving past the structure twice to scope it out after Teran received inside information about where the plants could be found in the building.  Finally, he recorded the license plate number of a truck that was parked in the warehouse yard and ran the number to find out the owner's name and address, which he then passed along to Teran so the other conspirators would have more information about the warehouse owner.  Taken together, those acts went well beyond "remote preparation" and were "strongly corroborative of the firmness of [Perez's] criminal intent."  See Ballinger, 395 F.3d at 1238 n.8; see also United States v. Carothers, 121 F.3d 659, 661–62 (11th Cir. 1997) (finding sufficient

---

[11] The attempt charge in Perez's indictment was focused solely on the planned warehouse theft.

17

evidence of a substantial step toward possessing cocaine with intent to distribute where (1) the defendant had previously purchased drugs from the seller, (2) the defendant discussed a possible cocaine deal with the seller, (3) the defendant drove to the city where the drug deal was to take place, and (4) the defendant possessed a gun as well as a microscope that could be used to test the cocaine being sold); United States v. Brown, 604 F.2d 347, 349–50 (5th Cir. 1979) (finding sufficient evidence that the defendant took a substantial step toward blowing up a building where he "made a firm agreement" to acquire the explosives he needed to do the deed and dispatched two other men "to reconnoiter and inspect the building in preparation for its destruction").[12]

## C. Cumulative Error

Perez argues that cumulative errors committed during his trial justify reversal of his convictions. He specifically identifies four purported errors in support of his argument. First, he asserts that the district court erroneously directed a verdict on an element when it gave the jury the following instruction: "As a matter of fact and law, the defendant was not authorized by law enforcement to perform the acts with which he is charged. To work with law enforcement and engage in undercover actions requires special approval which the Defendant did

---

[12] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

not have."  Second, he contends that the district court should have clarified which statements it was referring to when it instructed the jury that "certain prior statements of certain witnesses were admitted during the cross-examination of those witnesses for a limited purpose" and could "be considered [only] for impeachment purposes."  Third, he claims that the government improperly vouched for its witnesses and unfairly disparaged his own testimony when it said the following at closing:  "I submit to you there is only one witness who had an interest in the outcome of the case, one of the factors that the Court will tell you, is appropriate for you to consider.  One witness who had an interest in the outcome of the case and that is the defendant, Lawrence Perez."  Fourth, he contends that the government improperly disparaged defense counsel when it said at closing that Perez's lawyer "would like [the jury] to worry about [whether Teran paid Perez for his services] all day long because he doesn't want you to pay attention to the evidence."

"The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal."  United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotation marks omitted).  We review de novo the cumulative impact of errors at a trial, United States v. Dohan, 508 F.3d 989, 993 (11th Cir. 2007), but we will not

19

reverse a conviction unless the defendant can show that an aggregation of non-reversible errors affected his substantial rights, United States v. Capers, 708 F.3d 1286, 1299 (11th Cir. 2013).

For purposes of our analysis, we must first consider each error individually because a defendant cannot have a valid cumulative error claim if there was no error committed in the first place. Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012) ("This Court has made clear that where there is no error in any of the trial court's rulings, the argument that cumulative trial error requires that this Court reverse the defendant's convictions is without merit.") (brackets and quotation marks omitted). Once we have considered each individual alleged error, we "examin[e] any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." Id. We exclude from our analysis any alleged errors that were invited by the defendant. United States v. Banks, No. 11-1487, — F.3d —, 2014 WL 3805481, at *28 (10th Cir. Aug. 4, 2014) (holding that "cumulative error cannot be predicated on non-errors, or on invited error") (brackets, citation, and quotation marks omitted); see also Baker, 432 F.3d at 1214–16, 1228–29 (observing that the defendant invited an error that was committed at trial and then ignoring that error when analyzing the defendant's cumulative error claim); United States v. Necoechea, 986 F.2d 1273, 1282–83 (9th Cir. 1993) ("In reviewing for cumulative

20

error, the court must review all errors preserved for appeal and all plain errors.").

To determine whether a defendant was prejudiced by the cumulative effect of non-reversible errors, we consider:

> the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); [] the strength of the government's case, and the length of trial.

Baker, 432 F.3d at 1223 (alteration in original and quotation marks omitted).

In this case, we will not consider in our cumulative error analysis the first alleged error that Perez asserts (relating to the court's jury instruction that Perez was not authorized by law enforcement to engage in the charged acts) because Perez invited that purported error. See Banks, 2014 WL 3805481, at *28. As Perez concedes in his opening brief, the jury instruction at issue was included in the proposed instructions that he submitted to the district court. In addition, after the district court asked Perez whether he had any objections to the jury instructions, Perez responded that he had no objections. Because he proposed the jury instruction that he now complains about and later told the district court that he did not object to the instruction, Perez invited the alleged error. See United States v. Harris, 443 F.3d 822, 823–24 (11th Cir. 2006) ("The doctrine of invited error is implicated when a party induces or invites the district court into making an error.

Where a party invites error, the Court is precluded from reviewing that error on appeal."); see also United States v. Brannan, 562 F.3d 1300, 1306 (11th Cir. 2009).

We review the second alleged error with the district court's jury instructions only for plain error because Perez failed to object to the instruction. See United States v. Rodriguez, 627 F.3d 1372, 1380 (11th Cir. 2010). Under the plain error standard, Perez bears the burden of establishing that "(1) an error occurred; (2) the error was plain; (3) it affected [his] substantial rights; and (4) it seriously affected the fairness of the judicial proceedings." Id. Perez contends that the district court erred by failing to instruct the jury on which prior witness statements could be considered only for impeachment purposes. Perez has not shown plain error, however, because he has not established that his substantial rights were affected by the district court's failure to give a more specific jury instruction. The government presented overwhelming evidence against Perez, including many wiretap recordings in which Perez discussed his participation in the alleged crimes. It also presented testimony from numerous witnesses, most of which was admitted as substantive evidence against Perez. In light of the substantial evidence presented by the government, Perez has not shown that the district court's instruction affected his substantial rights. See id. at 1382 (noting that satisfying the third prong of the plain error standard "almost always requires that the error must have affected the outcome of the district court proceedings" and that a defendant "must

establish a reasonable probability of a different result but for the error") (quotation marks omitted).  So we do not consider it in our cumulative error analysis.

The third purported error that Perez asserts was not an error because the government's statement at closing that Perez was the "only . . . witness who had an interest in the outcome of the case" was not inappropriate.  The comment focused on Perez, did not allude to information that had not been presented to the jury, and did not improperly vouch for the credibility of the government's witnesses.  See United States v. Epps, 613 F.3d 1093, 1100 (11th Cir. 2010) ("Improper vouching occurs in two different circumstances: (1) if the prosecutor places the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity, or (2) if the prosecutor implicitly vouches for the witness' veracity by indicating that information not presented to the jury supports the testimony.") (brackets and quotation marks omitted).  Nor did the comment unfairly disparage Perez's testimony.  See United States v. Eley, 723 F.2d 1522, 1526 (11th Cir. 1984) ("Defense counsel in this case attacked the credibility of the government's witnesses and, in response, the prosecutor was entitled to argue fairly to the jury the credibility of the government and defense witnesses."); see also United States v. Poole, 735 F.3d 269, 277 (5th Cir. 2013) (noting that "where the defendant elects to testify and, in so doing, puts his veracity at issue," the government "does not commit error by characterizing the defendant as a liar");

23

United States v. Iacona, 728 F.3d 694, 699–700 (7th Cir. 2013) ("The central question in determining whether [prosecutorial comments were improper] is whether the comments reflected reasonable inferences from the evidence adduced at trial rather than an expression of the prosecutor's personal opinion, and whether the comments became so excessive as to impair the jury's detached search for the truth.  If the evidence supports the comments, a prosecutor is at liberty to speak harshly about the defendant.") (citations omitted).

Finally, we reject Perez's contention that the government improperly disparaged his attorney in closing arguments.  During defense counsel's closing, he argued that reasonable doubt existed as to whether Perez was guilty because Perez claimed to have a modest lifestyle and the government allegedly did not present much evidence that he was paid for the work he did with Teran.  In rebuttal, the government asked the jury to "look closely at [the] jury instructions" because there was "absolutely no requirement that [Perez receive] any financial benefit" to be guilty of the charged crimes.  The government then stated that defense counsel wanted the jury "to worry about money all day long because he [did not] want [the jury] to pay attention to the evidence."  Contrary to Perez's contention, the government's comment did not improperly disparage defense counsel and it was permissible given the argument that Perez's lawyer had made.

Perez has failed to identify a single preserved error or plain error that occurred at his trial. Therefore, his cumulative error argument fails because "[w]here there is no error or only a single error, there can be no cumulative error." United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011); see also Morris, 677 F.3d at 1132; United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004).

### III.  Conclusion

For these reasons, we affirm Perez's convictions.

**AFFIRMED**.[13]

---

[13] This appeal was originally scheduled for oral argument but was removed from the oral argument calendar by unanimous agreement of the panel under 11th Cir. R. 34-3(f).

25