[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-11165

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

PATRICK TONGE,
SERGE FRANCOIS,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cr-20399-DPG-2

_____

Before BRANCH, GRANT, and BRASHER, Circuit Judges.

PER CURIAM:

Patrick Tonge and Serge Francois were convicted of federal crimes arising out of their work at Atlantic Pharmacy & Compounding, a Florida pharmacy that collected over thirty-one million dollars in fraudulent claims from federal insurance programs. Both men challenge their convictions on direct appeal. After careful consideration and with the benefit of oral argument, we affirm their convictions and sentences.

## I.    Background

The defendants' convictions, and thus these appeals, begin and end with Atlantic Pharmacy, a pharmaceutical business that manufactured and sold custom medications. Serge Francois opened Atlantic in 2009, owned the business, and was the pharmacist-in-charge. Atlantic's business operations largely involved non-sterile compounding, specifically the creation of compound prescription creams ("CPCs") from scratch using various raw materials. Francois hired Patrick Tonge, his former used car dealer and personal trainer, to manage Atlantic's CPC business, despite Tonge having no pharmaceutical training. In total, Atlantic collected over thirty-one million dollars in claims for CPCs from TRICARE and the Federal Employee Health Benefits Program ("FEHBP"), two federal insurance programs.

In 2017, Tonge and Francois were indicted on federal charges including conspiracy, healthcare fraud, paying illegal healthcare kickbacks, introducing misbranded drugs into interstate commerce, money laundering, obstruction, and making false statements. The government alleged that Tonge and Francois stole millions of dollars from federal healthcare programs by (1) making misrepresentations about Atlantic that allowed the pharmacy to obtain access to federal insurance networks; (2) filing fraudulent claims based on invalid CPC prescriptions; and (3) paying illegal kickbacks to "marketers" who then paid doctors and patients to fuel Atlantic's CPC business.

After a lengthy trial in the Miami federal courthouse, jury deliberations began on Thursday, August 31. By Tuesday, September 5, Hurricane Irma had formed in the Gulf of Mexico. That afternoon, the district court informed the parties, outside the hearing of the jury, that one juror would have difficulties returning the next day due to the need to make storm-related preparations. Another juror needed to return a rental car by 6:00 PM that evening. The lawyers agreed to allow the jury to continue deliberating as long as possible on Tuesday, even going so far as to pay for an extra day of the juror's rental car to allow deliberations to continue past 6:00 PM. The jury returned a verdict that evening at or around 9:50 PM convicting Tonge and Francois of many of the charged offenses while acquitting each defendant of at least some counts.

Below, we describe the background of Atlantic's CPC business as it relates to the convictions at issue in this appeal. Because

Francois and Tonge were convicted, we take the evidence in the light most favorable to the government.

### A.  Atlantic's Misrepresentations to Gain Admission to a Federal Insurance Network and Obtain a DEA Registration

TRICARE and the FEHBP contracted with a pharmacy benefit manager, Express Scripts International, to establish a network of healthcare providers for use by the programs' beneficiaries. Membership in Express Scripts's network was an *ex ante* requirement for submitting a claim to either TRICARE or the FEHBP. Any pharmacy that wanted to submit claims for CPCs would also have been required to possess a Drug Enforcement Administration ("DEA") registration to dispense or handle controlled substances in the pharmaceutical context. Atlantic was admitted to Express Scripts's network and received a DEA registration, allowing it to submit claims to TRICARE and the FEHBP and work with CPCs containing controlled substances.

In obtaining these privileges for Atlantic, Francois made substantial misrepresentations to Express Scripts and the DEA. First, Francois lied about himself and Atlantic throughout the pharmacy's interactions with Express Scripts. Francois submitted Atlantic's initial application in 2010 and made subsequent recertifications in 2013 and 2014. As part of these interactions, Francois stated that his sister Rosemary owned Atlantic, that his DEA license had never been suspended, that he had never been arrested, that he had never filed for bankruptcy, and that Atlantic had never paid more than twenty-five thousand dollars to any subcontractor. Each of those

representations was false. If Francois had been truthful, Express Scripts would never have credentialed Atlantic as an in-network provider, walling it off from TRICARE and FEHBP claims. And second, Francois lied during Atlantic's DEA registration by asserting that his DEA license had never been suspended when in fact, it had been. Were it not for this lie, the DEA would have never granted Atlantic a registration allowing the pharmacy to fill and dispense CPC prescriptions involving controlled substances.

## B.  Atlantic's Fraudulent CPC Business

The problems at Atlantic Pharmacy did not end with Francois's misrepresentations to Express Scripts and the DEA. To receive payment from Express Scripts on any given claim, an in-network pharmacy had to satisfy two requirements: (1) the prescription underlying the claim had to be valid and (2) the patient had to have been charged a co-payment. For a prescription to be valid, a physician had to have examined the patient, the prescription needed to have been medically necessary, and the pharmacy needed to have been licensed in the patient's home state. Although Francois and Tonge processed, certified, and submitted Atlantic's CPC claims to Express Scripts, those claims systematically failed to meet either requirement.

Atlantic's CPC operations proceeded as follows. First, a physician would send a prescription to Atlantic where it would be processed and entered into a computer system. The employee entering this information was required to be a licensed pharmacist or

pharmacy technician. Then, the processing employee submitted the file to Express Scripts for approval, and Atlantic filled the prescription if the claim was eventually approved. Despite his complete lack of pharmaceutical training, Tonge processed many of Atlantic's CPC prescriptions and submitted many of its claims. Next, after Express Scripts approved a prescription, a pharmacy technician manufactured the CPC, and a pharmacist, usually Francois, reviewed and certified it as valid. Finally, Atlantic would dispense the CPC to a patient, often mailing prescriptions to patients living in states where Atlantic was not licensed to do business.

The fraudulent nature of Atlantic's CPC business was due just as much to its marketing, which relied on paying doctors and patients to generate prescriptions, as its fulfillment practices. Over the life of the business, Atlantic contracted with several different "marketers" to promote its CPCs: DIRIV, PGRX, and RX. In each case, Atlantic agreed to pay a percentage of the profits earned on every CPC back to the marketer that referred the prescription. In turn, Atlantic's marketers paid doctors, patients, and other parties to obtain access to the physician signatures and federal insurance beneficiary identities required to submit fraudulent claims to TRICARE and the FEHBP. Atlantic maintained close ties with its marketers, oftentimes directly involving itself in the scheme by (1) engaging in detailed negotiations with marketers and doctors concerning the kickback percentage that Atlantic would pay; (2) changing the chemical formulas that it requested marketers write prescriptions for; (3) ignoring credible reports that at least some CPC

prescriptions were being written using forged physician signatures; and (4) attempting to hire away marketers' physicians to work directly for Atlantic

### C.  Atlantic's Attempts to Conceal its Fraud

Perhaps unsurprisingly, many patients contacted Atlantic to try to return medications that they knew nothing about and neither needed nor wanted. To minimize losses from repayment obligations and conceal the number of attempted returns, Francois and Tonge adopted a policy to try to convince reluctant patients to keep their CPCs. Francois directed Tonge and another Atlantic employee, Amanda Lee, to tell patients that their medications were free because Atlantic was not charging any co-payment. But Tonge knew that co-payment reduction policies violated federal law because he had written himself an email explaining as much. Francois also lied to investigators during their search of Atlantic's offices to prevent the discovery of equipment used to conduct the CPC business, was present on an email chain where Tonge asked the owners of RX, Celep and Sonsoles Simsir, to destroy physical and electronic evidence, and traveled to Lee's home to demand that she not incriminate him in the fraud. Tonge deleted emails from an account he used to conduct pharmacy business when it became clear that Atlantic was under suspicion.

Although Tonge and Francois attempted to conceal the fraudulent nature of Atlantic's operations, that fraud was nevertheless open and obvious. One of Atlantic's pharmacists quit three

months after being hired due to his perception of rampant fraud, and other employees believed fraud was occurring based on daily calls from customers complaining about unwanted CPCs. Despite these events, Francois certified CPC prescriptions as valid that his former employee had rejected as fraudulent.

## II.    Standards of Review

We review prosecutorial misconduct claims and the sufficiency of the evidence *de novo*. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006); *United States v. Mendez*, 528 F.3d 811, 814 (11th Cir. 2008). Evidentiary rulings and refusals to give a requested jury instruction are reviewed for abuse of discretion. *United States v. Tokars*, 95 F.3d 1520, 1530–31 (11th Cir. 1996). And although "[w]e review *de novo* the legal question of whether an indictment sufficiently alleges a statutorily proscribed offense . . . a district court's denial of a motion to dismiss an indictment is reviewed for abuse of discretion." *United States v. Seher*, 562 F.3d 1344, 1356 (11th Cir. 2009). Claims not preserved at trial are reviewed only for plain error, meaning the defendant bears the burden of establishing an error that was plain, affected his substantial rights, and seriously affected "the fairness, integrity, or public reputation of judicial proceedings." *United States v. Gonzalez*, 834 F.3d 1206, 1218 (11th Cir. 2016). Non-constitutional error is harmless when it does not affect the substantial rights of the parties. *United States v. Gallegos-Aguero*, 409 F.3d 1274, 1277 (11th Cir. 2005).

## III.    Discussion

Tonge and Francois challenge their convictions on a number of grounds, some raised by both defendants and some only by Francois. We discuss each issue in turn below, specifying the applicable defendant or defendants.

### A. Sufficiency of the Indictment

Francois begins by challenging the sufficiency of Counts One through Nineteen of the Fourth Superseding Indictment. Because the indictment's text mirrored the relevant statutes and in several cases was nearly identical to language we have expressly approved, the challenged counts were legally sufficient on *de novo* review. Thus, we conclude that the district court did not abuse its discretion in denying Francois's motion to dismiss.

As an initial matter, Francois has waived any challenge as to the sufficiency of Count Fourteen. Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure requires that any claim of defect in an indictment "be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." FED. R. CRIM. P. 12(b)(3)(B). When a criminal defendant fails to properly raise a defense based on a defect in the indictment "that was clear from the face of the indictment and that does not satisfy any of the exceptions set forth in [Rule 12]" he "waive[s] this issue by failing to raise it in a pretrial motion." *United States v. Ramirez*, 324 F.3d 1225, 1227 (11th Cir. 2003). Because Francois's motion to dismiss did not cover Count

Fourteen and there has been no argument that either of Rule 12's exceptions apply, Francois has abandoned any sufficiency challenge as to that count.

Francois's properly raised challenges to Counts One through Thirteen and Fifteen through Nineteen fare no better. A legally sufficient indictment must "contain[] the elements of the offense charged and fairly inform [the] defendant of the charge against which he must defend." *Hamling v. United States*, 418 U.S. 87, 117 (1974). It must also "enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.* We have explained that "we need not find an indictment defective simply because it fails to allege *mens rea* so long as the allegation that the crime was committed with the requisite state of mind may be inferred from other allegations in the indictment." *Seher*, 562 F.3d at 1356. And generally, "practical, rather than technical, considerations govern." *Id.* (quoting *United States v. Hooshmand*, 931 F.2d 725, 735 (11th Cir. 1991)).

Counts One through Thirteen of the indictment were legally sufficient because they mirrored the relevant statutes, charging Francois with knowingly and willfully conspiring "to knowingly and willfully execute a scheme and artifice to defraud a health care program . . . by means of materially false and fraudulent pretenses, representations, and promises." To begin with, the conspiracy statute is almost identical to the indictment, criminalizing "attempt[ing] or conspir[ing] to commit any offense under [Chapter 63]," including healthcare fraud, which is defined as "knowingly

and willfully execut[ing], or attempt[ing] to execute, a scheme or artifice . . . in connection with the delivery of or payment for health care benefits, items, or services . . . to defraud any health care benefit program; or . . . obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program[.]" 18 U.S.C. §§ 1347, 1349. The indictment also identified the manner and means of the charged conspiracy and alleged that Francois "knowingly caused Atlantic to submit $37,263,519 in false and fraudulent claims to TRICARE and [the] FEHBP for compounded medications which were not medically necessary, not properly prescribed by a licensed medical professional and often not provided to TRICARE and FEHBP beneficiaries." Thus, Count One of the indictment took pains to "fairly inform [Francois] of the charge[s] against which he must defend." *Hamling*, 418 U.S. at 117. Counts Two through Thirteen, which charged specific acts of healthcare fraud, contained the same mirroring language and description of the alleged scheme to defraud. And like Count One, Counts Two through Thirteen charted relevant information for each count, including the TRICARE beneficiary, the date of the claim, the prescription number, the amount claimed by Atlantic, and the first ingredient in each prescription.

In addition, Counts One through Thirteen were sufficient as a matter of law in the light of our recent decision upholding an indictment for healthcare fraud and conspiracy using language nearly identical to that used in this case. *See United States v. Chalker*, 966

F.3d 1177, 1190–91 (11th Cir. 2020). We held in *Chalker* that the indictment, far from being "too vague to pass muster," instead "specifically referred to and tracked the language of the statute on which it was based" and "provided notice to the defendant of the charges to be defended." *Id.* at 1191 (cleaned up). What we said of the language in *Chalker* holds true for the nearly identical language at issue today.

Francois's argument regarding Counts Fifteen through Nineteen, which charged the payment of healthcare kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), fails for the same reasons: namely that the indictment mirrored the statutory text and provided Francois sufficient notice of the charges to be defended. Counts Fifteen through Nineteen charged that Francois "did knowingly and willfully offer and pay any remuneration, that is, kickbacks and bribes . . . to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by . . . TRICARE." The anti-kickback statute criminalizes "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b). The indictment tracked the anti-kickback statute almost word for word. In addition, Counts Fifteen through Nineteen charted relevant

information for each Count, including the approximate date and amount of the charged kickback payments. Just as we said of the healthcare fraud indictment in *Chalker*, Counts Fifteen through Nineteen "specifically referred to and tracked the language" of the anti-kickback statute and "provided notice to [Francois] of the charges to be defended." *Chalker*, 966 F.3d at 1191 (cleaned up).

Thus, we conclude that the indictment was legally sufficient and that the district court did not abuse its discretion by declining to grant Francois's motion to dismiss.

## B. Evidentiary Issues

### 1. Kazarian's Testimony

Tonge and Francois each challenge the testimony of David Kazarian, the government's expert witness on pharmacy practices. Both defendants argue that Kazarian's testimony exceeded the scope of the government's expert notice, while Francois separately claims that he gave improper lay witness testimony under Federal Rule of Evidence 701. Because Kazarian testified as an expert and did so within the scope of the government's notice, the district court did not err in admitting his testimony.

First, Francois's challenge to Kazarian as having presented improper lay witness testimony fails as a matter of fact. Kazarian was properly qualified as an expert, testified as an expert at trial, and was the subject of several objections by defense counsel based on his testimony being constrained by the government's expert notice. At trial, Francois never objected to Kazarian's testimony as

being improper lay opinion, instead focusing on evidentiary issues only relevant to expert testimony. While the prosecution did plan to elicit lay opinion from former Atlantic employees under Rule 701, it had nothing to do with Kazarian.

Second, Tonge and Francois's joint challenge to Kazarian's testimony as outside the scope of the government's expert notice also fails. "We review for abuse of discretion the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion." *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018) (quoting *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004)). "[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." *Frazier*, 387 F.3d at 1259. Specifically, we "will not overturn an evidentiary ruling and order a new trial unless the objecting party has shown a substantial prejudicial effect from the ruling." *Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir. 2001). "Substantial prejudice goes to the outcome of the trial; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *Barton*, 909 F.3d at 1331 (cleaned up). If a defendant does not object, we review only for plain error. *Frazier*, 387 F.3d at 1268 n.21.

The government's expert notice provided that Kazarian would testify on the standard practices of pharmacies like Atlantic. Specifically, the notice highlighted two topics: (1) whether automatic refilling and dispensation-by-mail without notification to or

request by a patient was standard practice; and (2) whether pharmacists were obligated to investigate certain "red flags" that indicate a potentially invalid prescription. The government stated that "[Kazarian] will not be opining on highly technical issues, such as causation, medical procedures, or damages" and agreed not to ask him to discuss "the quality or usefulness of the medications [that Atlantic] sold."

On abuse of discretion review, there is no evidence that the district court "made a clear error of judgment" or "applied the wrong legal standard" by allowing Kazarian to explain that it would be a red flag for a large number of differently situated patients to receive prescriptions for the exact same dosage. *See id.* at 1259. At trial, Kazarian testified over objection that an 85-year-old and 11-year-old receiving the exact same dosage would have been a red flag. During the remainder of Kazarian's testimony, the defense made only one additional overruled objection based on the scope of the expert notice, this time dealing with Kazarian's explanation that the surface area-to-weight ratio differences between adults and children would have made it unusual to see an adult and a child receive the same dosage. In fact, the district court actually sustained a defense objection preventing Kazarian from "getting into the minutia of efficacy and the dangers to an 11-year-old girl from having certain creams with steroids." Each time the defense's objection was overruled, the district court did so to allow Kazarian to testify that a substantial similarity in dosage between patients of different ages would have been unusual based on the general

principle that differently situated patients have different medical needs. Because Kazarian never discussed the specific "quality or usefulness" of the medications that Atlantic sold, his testimony on red flags was not improperly admitted.

Although Tonge and Francois do challenge other elements of Kazarian's testimony, in the absence of a contemporaneous objection we review the remainder of that testimony only for plain error. *Id.* at 1268 n.21. Nothing about what was left of Kazarian's testimony, which explained the concept of red flags and applied it to the facts of Atlantic's CPC business, was plainly outside the government's expert notice As such, the district court did not err in admitting that testimony.

### 2. Francois's Prior Arrest

Francois separately argues that the district court abused its discretion in admitting a stipulation between Francois and the government concerning a prior arrest. He claims that the evidence was inadmissible under Federal Rule of Evidence 404(b), but the government argues that any error was invited by stipulation and that the evidence was admissible to prove Francois's knowledge and lack of mistake.

Assuming for the sake of argument that Francois did not invite the error, we cannot say the district court abused its discretion in admitting Francois's prior misrepresentation to an insurance network about his arrest record. This evidence pertained directly to Francois's knowledge and lack of mistake when he made similar

misrepresentations to the government. FED R. EVID. 404(b)(2); *United States v. Delgado*, 56 F.3d 1357, 1366 (11th Cir. 1995). The government had to prove that Francois's misrepresentations were knowing and willful rather than the result of simple mistake or poor management. *See* 18 U.S.C. § 1347; *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007). And the government sought to argue that Francois acted knowingly because he had made similar misrepresentations before and had been terminated because of it. The district court did not abuse its discretion in weighing the probative value of this evidence against its potential prejudice.

## C. Prosecutorial Misconduct

Francois next argues that the district court plainly erred when it declined to *sua sponte* find prosecutorial misconduct over the course of the trial, claiming that misconduct took two forms: (1) various remarks by the prosecution regarding Francois's real estate purchases, nickname at Atlantic Pharmacy, and communications with his wife about his work at Atlantic; and (2) government intimidation of Jason Perlman, an attorney for one of Atlantic's marketers. As Francois did not object to the challenged remarks as misconduct at trial, we review only for plain error. *United States v. Goldstein*, 989 F.3d 1178, 1199 (11th Cir. 2021). On plain error review, we will only reverse "when prosecutorial misconduct was so pronounced and persistent that it permeated the entire atmosphere of the trial." *United States v. Mueller*, 74 F.3d 1152, 1157 (11th Cir. 1996). Because none of the challenged remarks were misconduct and the district court properly addressed Francois's witness

18                    Opinion of the Court                    18-11165

intimidation allegations, we conclude that the district court did not plainly err.

### 1. Prosecutorial Remarks

To establish prosecutorial misconduct, a defendant must show that the prosecution's remarks were improper and that they prejudicially affected the defendant's substantial rights. *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different. When the record contains sufficient independent evidence of guilt, any error is harmless." *Id.*

Four factors guide our analysis of whether prosecutorial remarks had a reasonable probability of changing the outcome of a trial: "(1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused." *Davis v. Zant*, 36 F.3d 1538, 1546 (11th Cir. 1994). When making this inquiry, we must consider "the context of the entire trial." *Lopez*, 590 F.3d at 1256.

Here, Francois challenges the government's references to the fact that he purchased a three-point-six million dollar home formerly owned by a celebrity, that his nickname at Atlantic was "POTUS," and that he sent a confrontational text message to his

wife that discussed his work at Atlantic. None of these statements constituted misconduct because each concerned relevant evidence for the government's case and did not prejudice Francois's substantial rights.

First, the government's references were relevant. The prosecution told the jury in its opening statement that it would learn that "Francois lived like a celebrity. . . . spent $3.6 million to buy a home that used to be owned by Dwayne, 'The Rock' Johnson," and "was called POTUS, for President of the United States." On cross-examination of Francois, the government reemphasized these facts. The prosecution also read a text message from Francois to his wife that stated in part: "I am here with four doctors that bring me money so go take your talk somewhere else." Each remark was directly relevant to the criminal conduct that the government was required to prove beyond a reasonable doubt. The fact that Francois spent millions of dollars drawn from Atlantic's accounts to purchase a home bore directly on Count Twenty-Seven (money laundering) and circumstantially on fraud. Similarly, Francois's nickname being "POTUS" was directly relevant to his leadership role and knowledge of events occurring at the pharmacy, which were essential to the prosecution's allegations of fraudulent conduct and conspiracy. Likewise, Francois's message to his wife was relevant to show that he had met directly with the doctors that generated Atlantic's fraudulent CPC prescriptions. That meeting bore on Francois's knowledge that the prescriptions Atlantic was filling, and thus the insurance claims that it was filing, were categorically

false, which we have held to be a required element of a healthcare fraud prosecution under Section 1347. *Medina*, 485 F.3d at 1297.

Even if the prosecution's remarks had been improper, they would not have been reversible error because they did not prejudice Francois's substantial rights. Francois testified on direct examination that his nickname was "POTUS" because he "used to snoop around with the cameras in the pharmacy." Another Atlantic employee testified that Francois was nicknamed "POTUS" because he was Atlantic's leader and that Francois bragged about purchasing a house "that the Rock used to live in." And Francois had the opportunity to explain his version of the facts to the jury. Lastly, the government used Francois's text messages with his wife to rebut his earlier testimony that he had "left [the promotion of Atlantic's CPCs to doctors and patients] all to the marketers." On balance, three isolated remarks, largely cumulative of other properly admitted evidence, cannot be said to have "permeated the entire atmosphere" of a lengthy jury trial on plain error review. *See Mueller*, 74 F.3d at 1157.

### 2. Witness Intimidation

Francois's second argument for misconduct—witness intimidation—is also meritless. "Where defendants present evidence to the district court that the government intimidated a defense witness a trial court must grant a hearing to determine whether the allegations of intimidation are true." *United States v. Schlei*, 122 F.3d 944, 992 (11th Cir. 1997). Here, Francois made such allegations after Perlman retained counsel and informed Francois that he

would assert his Fifth Amendment privilege if called as a witness. The district court set an evidentiary hearing to address the issue, but Francois withdrew his allegations before the hearing occurred, stating that "[w]e are now withdrawing anything involving the Perlman issue" and "in terms of other issues with Mr. Perlman, including any allegations or anything, they are all withdrawn." Because Francois produced no evidence, declined the district court's scheduled evidentiary hearing, and expressly disclaimed any previous allegations, the district court did not err. *See Schlei*, 122 F.3d at 991–92.

### D. The Jury Instructions

Tonge and Francois argue that the district court erred by giving essentially the pattern jury instruction on healthcare fraud. Specifically, the defendants contend that our recent decision in *United States v. Medina* obligated the district court to accept a proposed modification to the pattern instruction inserting a requirement that the government prove that "the defendant[s] knew the claims, bills to TRICARE, identified in the indictment were, in fact, false or fraudulent." *See* 485 F.3d 1291. We disagree.

"Reviewed for abuse of discretion, failure to give a requested instruction is reversible only where the instruction (1) was correct, (2) was not substantially covered by a charge actually given, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007). "We will not reverse a conviction based on a jury

instruction challenge unless we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *United States v. Clay*, 832 F.3d 1259, 1310 (11th Cir. 2016) (cleaned up). A conviction will stand "when the jury instructions, taken together, accurately express the law applicable to the case without confusing or prejudicing the jury . . . even though isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism." *Id.* (cleaned up). And the Supreme Court has explained that "in reviewing jury instructions, our task is . . . to view the charge itself as part of the whole trial." *United States v. Park*, 421 U.S. 658, 675 (1975).

We believe the district court's jury instruction accurately conveyed the requisite criminal state of mind under our healthcare fraud precedents. Although we have held that "in a health care fraud case, the defendant must be shown to have known that the claims submitted were, in fact, false," our decision in *Medina* stands only for the proposition that "on the facts of [that] case . . . paying kickbacks alone [was] not sufficient to establish health care fraud." *Medina*, 485 F.3d at 1297–98. That is, *Medina* required that the government prove a defendant's knowledge of falsity but remained largely silent as to the methods by which that knowledge could be proven. Here, the court's instruction sufficiently informed the jury that it could convict only if it determined that Francois and Tonge knew that their statements were false. It said that the defendants had to act "knowingly and willfully" and "intend[] to defraud" by making "false or fraudulent" "representations . . . about a material

fact that the speaker knows is untrue or makes with reckless indifference as to the truth and makes with intend to defraud."

In *United States v. Clay*, we made explicit the implicit limitation in *Medina*, concluding that "although the government must prove the defendant's knowledge of falsity, a defendant's knowledge can be proven in more than one way." *Clay*, 832 F.3d at 1311 (cleaned up). There, we held that a district court did not reversibly err by giving a healthcare fraud instruction substantially identical to the pattern instruction. *Id.* The *Clay* instruction differed from the pattern only by replacing "reckless indifference" with "deliberate indifference," a modification that neither Francois nor Tonge requested. The district court did not abuse its discretion in denying Tonge and Francois's proposed modifications to the pattern jury instruction.

## E. Jury Coercion

Next, Tonge and Francois argue that their jury was coerced by an impending natural disaster. Both defendants argue that the district court plainly erred by allowing the jury to deliberate as Hurricane Irma approached Miami. The court did not. It allowed the jury to continue deliberating in the face of a projected severe weather event that was several days away. But it did not rush the jury's verdict, instruct the jury that they had to return a verdict before the hurricane landed, or otherwise coerce a verdict.

Tonge and Francois argue that our decision in *Lucas v. American Manufacturing Co.*, 630 F.2d 291 (5th Cir. 1980),

supports their position. We disagree. In *Lucas*, a jury began deliberating with a hurricane expected to impact the courthouse within the hour, and the judge instructed the jury that its deliberations could last no longer than 15 minutes. Unsurprisingly, the jury quickly returned with an incomprehensible split verdict. In remanding for a new trial, we explained that "[t]he imminence of [a] hurricane might . . . require[] that the jury be sent home" but held that "concern for the jurors' well-being . . . does not excuse . . . efforts to coerce a verdict." *Id.* at 293.

Tonge and Francois's case is readily distinguishable. First, unlike in *Lucas*, the jury had plenty of time to deliberate. Hurricane Irma struck Miami several days after the verdict and more than a week after the start of deliberations, whereas the hurricane's arrival in *Lucas* was imminent and left the jury with about forty-five minutes for deliberations. Second, unlike in *Lucas*, the district court did not charge the jury to rush to a verdict to avoid the hurricane. Third, Tonge and Francois's convictions lack the anomalies we identified as indicia of coercion in *Lucas*. *Id.* at 293. Although the defendants were convicted of some charges and acquitted of others, there is no reason to believe that the court "pressure[ed] a minority of the jurors to sacrifice their conscientious scruples for the sake of reaching agreement." *Green v. United States*, 309 F.2d 852, 854 (5th Cir. 1962). Finally, although Tonge and Francois argue that the mere act of allowing the jury to deliberate was *per se* coercion, there is nothing inherently coercive about allowing a jury

to begin deliberations at the close of a trial or to continue deliberations that had begun a week before.

## F. Sufficiency of the Evidence

Lastly, both Tonge and Francois argue that the district court erred by declining to grant a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 based on the insufficiency of the evidence. Because the government presented overwhelming evidence that both defendants were knowing and willful participants in a complex scheme to defraud federal insurance programs by paying healthcare kickbacks, we disagree.

As an initial matter, Tonge and Francois have waived sufficiency arguments regarding several counts of their convictions. Although Tonge correctly notes that his Rule 29 motion covered every count, his briefing completely ignores many of those counts, instead focusing only on whether there was sufficient evidence to convict on Counts One and Three through Thirteen. We have consistently held that an appellant abandons an argument when his briefing merely references the argument in passing and contains no substantive discussion of the issue. *Zhou Hua Zhu v. U.S. Att'y Gen.*, 703 F.3d 1303, 1316 n.3 (11th Cir. 2013); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–83 (11th Cir. 2014). By presenting argument on sufficiency only as to certain counts, Tonge has abandoned any sufficiency challenges to all others. The same result obtains to Francois, who only argues that there was insufficient evidence to convict on Counts One through Nineteen. On review of the properly challenged counts, we conclude that the

government presented evidence more than sufficient to allow a reasonable jury to convict.

To support a conviction under the healthcare fraud statute, the government must prove that a defendant "knowingly and willfully execute[d] . . . a scheme or artifice . . . (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services." 18 U.S.C. § 1347. We have explained that "in a health care fraud case, the defendant must be shown to have known that the claims submitted were, in fact, false." *Medina*, 485 F.3d at 1297.

To convict the defendants of paying healthcare kickbacks, the government had to prove that they "knowingly and willfully offer[ed] or pa[id] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in case or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal healthcare program." 42 U.S.C. § 1320a-7b(b)(2)(A). "Willful conduct under the Anti-Kickback statute means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Nerey*, 877 F.3d 956, 969 (11th Cir. 2017) (explaining that

"attempts to hide . . . illegal kickbacks" were evidence of willfulness). But a defendant "need not have known that a specific referral arrangement violated the law" to be properly convicted. *United States v. Sosa*, 777 F.3d 1279, 1293 (11th Cir. 2015).

To support a conviction for conspiracy, the government had to prove: "(1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013). Circumstantial evidence alone can prove agreement, including "where the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him" and the defendant commits acts in furtherance of the conspiracy. *Id.* at 1273–74.

The government's theory of Counts One through Nineteen was that Atlantic stole millions of dollars from TRICARE and the FEHBP by knowingly and willfully conspiring to pay illegal kickbacks and submit fraudulent insurance claims. Each claim to TRICARE or the FEHBP had to satisfy three requirements: (1) the claim had to come from an in-network pharmacy; (2) the beneficiary had to be charged a co-payment; and (3) the underlying prescription had to be valid, meaning that the prescribing physician must have examined the patient, the prescription must have been medically necessary, and the patient must have received the prescription in a state where the pharmacy was licensed to do business. Although none of Atlantic's CPC claims satisfied these requirements, Francois and Tonge's misrepresentations enabled it to

collect over thirty-one million dollars in claims based on fraudulent prescriptions.

First, the prosecution produced evidence that Atlantic was admitted to Express Scripts's network and received a DEA registration solely based on Francois's misrepresentations about himself and his pharmacy. Were those misrepresentations never made, Atlantic would have been foreclosed from filing a single fraudulent CPC claim. Francois told the government that his sister owned Atlantic, that his DEA license had never been suspended, that he had never filed for bankruptcy or been arrested, and that Atlantic had never paid more than $25,000 to a subcontractor. Every one of these representations was false. In fact, Francois owned Atlantic, his DEA license had been suspended, he had previously been arrested and filed for bankruptcy, and Atlantic had paid millions of dollars to subcontractors as part of its efforts to market its products. Francois knew that these misrepresentations were material because he had previously been terminated by Humana after it discovered evidence of the same misrepresentations underlying its relationship with Atlantic. Humana's termination letter described Francois's lies in excruciating detail, yet Francois repeated them to the DEA and Express Scripts in order to gain access to TRICARE and the FEHBP.

Second, the jury was presented sufficient evidence to conclude that Tonge and Francois knew the prescriptions underlying Atlantic's CPC claims were invalid and the fruit of a complex system of healthcare kickbacks. Atlantic's CPC business relied on

marketing contracts that exchanged kickbacks for fraudulent prescriptions. The jury could find that Tonge and Francois knew about those contracts because their co-conspirators testified extensively that both men negotiated them and were intimately involved in their performance. *See United States v. Broadwell*, 870 F.2d 594, 601 (11th Cir. 1989) ("Testimony of a co-conspirator, even if uncorroborated, is sufficient to support a conviction."). Tonge changed the chemical formula of the CPCs that Atlantic asked PGRX to prescribe to maximize profits, modified PGRX prescriptions after they were delivered, and sent PGRX pre-filled prescriptions for its doctors to sign and return. Tonge asked Mark Messenger, one of PGRX's doctors, to leave the company and work directly for Atlantic, promising an improved kickback as an incentive. He also encouraged Messenger to bring his colleagues with him in exchange for even more money. Meanwhile, Francois knew that at least some of DIRIV's prescriptions were fraudulent because a doctor personally called to explain that an assistant had forged his signature. Yet Francois continued to do business with DIRIV and fill forged prescriptions from the same physician's office. During negotiations with RX, Tonge stated that Atlantic would not pay more than forty percent in kickbacks, even for a "high volume" marketer that promised that its business was "all TRICARE." Everyone involved in the RX negotiations understood that the arrangement relied on the Simsirs having "a doctor who would write just about anything." Once the fruit of these negotiations—hundreds of fraudulent CPC prescriptions—arrived at the pharmacy, Tonge processed them and submitted claims to Express Scripts despite lacking

the required pharmaceutical training. And after Express Scripts approved a claim, Francois certified the prescriptions and Atlantic improperly dispensed the CPCs, oftentimes by mailing medications to states where it was not licensed to do business.

Throughout their time at Atlantic, Tonge and Francois took numerous steps to minimize their losses and conceal their fraud. Atlantic implemented a policy to convince troubled patients that they should keep the medications Atlantic had sent them by waiving mandatory co-payments. Tonge knew that this practice was illegal and made a written record memorializing that knowledge but participated in the scheme regardless. Sonsoles Simsir testified that Francois requested that RX pay kickbacks in cash, and another co-conspirator testified to repeated conversations where he was admonished to stop a doctor from publicly saying that Atlantic owed him money. Later, Francois would lie to investigators in an effort to prevent evidence from being collected, work with Tonge to ask the Simsirs to destroy evidence outside of Atlantic's direct control, and demand that Lee lie to protect him. At the same time, Tonge was deleting emails from an account that he used to conduct pharmacy business.

Despite the defendants' attempts at concealment, the fraud at Atlantic was open and obvious. Multiple employees understood that something was rotten in South Florida, and at least one pharmacist quit rather than be party to what he viewed as obviously criminal conduct. Throughout, Francois led the pharmacy as if this was business as usual, including making the decision to certify CPC

prescriptions as valid that a former employee had refused to sign off on. At trial, Kazarian explained that the whole of Atlantic's CPC business was one giant red flag, such that any reasonable pharmacist would have assumed that the prescriptions were invalid and that someone was being paid. Francois, the owner and pharmacist-in-charge, saw all of this and knew exactly what it meant, admitting that Atlantic's CPC business was "all show." *See Sosa*, 777 F.3d at 1293 (explaining that "the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal"); *Vernon*, 723 F.3d at 1267 (stating that the jury "could have inferred that [the defendant's] position as CEO of Medfusion required that he familiarize himself with significant statutes regulating the pharmaceutical industry, including the Anti–Kickback statute") And finally, Francois testified that he did not know that the claims were false or that Atlantic was paying kickbacks. The jury was within its rights to disbelieve his testimony as to both assertions. *See United States v. Mateos*, 623 F.3d 1350, 1362 (11th Cir. 2010) (explaining that "a defendant who chooses to testify runs the risk that the jury will disbelieve her testimony, and runs the risk that if disbelieved the jury might conclude the opposite of her testimony is true") (cleaned up).

We conclude that the jury received sufficient evidence to convict Tonge and Francois on each of the challenged counts.

## IV.    Conclusion

For the foregoing reasons, Tonge and Francois's convictions and sentences are **AFFIRMED.**